ROGERS, Justice.
 

 Six residents and taxpayers of the Parish of East Baton Rouge brought suit attacking the constitutionality of Act 384 of 1940 and seeking injunctive relief against the Governor and other state officials. Exceptions and an answer were filed by the defendants. After a hearing on the rule nisi, the trial judge overruled the exceptions and granted plaintiffs a preliminary injunction against the defendants, A. P. Tugwell, State Treasurer, and L. B. Baynard, State Auditor, plaintiffs having abandoned their suit against the defendants, Sam H. Jones, Governor, and Jerome Hayes, Budget Officer.
 

 The trial judge dismissed plaintiffs’ suit against Grady C. Durham, who had superseded Jerome Hayes as Budget Officer.
 

 Under the terms of the preliminary injunction, the State Treasurer and the State Auditor are prohibited “from accepting,
 
 *526
 
 honoring, and acting upon notice or notices from Grady C. Durham, or any other individual claiming authority to exercise the duties as ‘Budget Officer,’ to transfer funds appropriated to various state agencies named in Act 44 of 1940, to the agencies listed under Act 384 of 1940, upon the plaintiff furnishing bond, according to law, in the sum of Five Hundred ($500.00) Dollars.”
 

 Upon the application of the State Treasurer and the State Auditor, this Court ordered that the record be brought here for the purpose of reviewing the judgment of the trial judge, and, pending such, review, that all further proceedings in the suit be suspended. On April 28, 1941, the return day fixed in our order, the matter was submitted on the record and the briefs filed by the parties as provided in section 4 of Rule XI of this Court.
 

 While the case was under consideration by the Court, the Attorney General filed a motion on behalf of the relators requesting that we suspend our rule and permit the. case to be reopened and orally argued, because of the importance of the issues involved therein. In view of the public interest in the matter, we granted the motion of the Attorney General and assigned the case for oral argument on June 2, 1941. On the day fixed, the case was extensively argued by counsel representing the parties, after which it was resubmitted to the Court for decision.
 

 In the brief filed on the original submission of the case, counsel for the relators suggested that because of the necessity for a prompt determination of the constitutional questions involved, the Court should pretermit any discussion of the exceptions filed by relators and limit its review only to those questions involved on the merits of the case. But in their oral argument and in their supplemental brief filed in connection therewith, counsel for relators, disregarding their previous suggestion, insisted that the Court should dispose of relators’ exceptions, which they exhaustively discussed. This change of position on the part of counsel'' for relators necessarily requires the Court to pass upon the exceptions interposed by relators to the respondents’ suit.
 

 In the district court, the following exceptions were filed on behalf of relators and overruled by the trial judge, to-wit: (1) An exception to the jurisdiction of the court ratione materiae; (2) an exception to the jurisdiction of the court ratione personae; (3) an exception of no cause of action; and (4) an exception of no right of action and want of interest in the plaintiffs. We shall dispose of the exceptions in the order of their statement.
 

 (1) In support of the exception to the jurisdiction ratione materiae, the relators argue that the courts are without right to pass upon the constitutionality of an amendment to an existing constitution; that the question is a political one over which the courts have no control. The argument is not sound.
 

 The question of the validity of the adoption of an amendment to the constitution is a judicial and not a political question. The general rule governing the jurisdiction of the courts in such cases is
 
 *528
 
 stated in American Jurisprudence, Constitutional Law, Volume 11, section 33, page 639, as follows:
 

 “Since amendments to Constitutions derive their force from the people, it is generally recognized that judicial tribunals have no right to. question the wisdom or expedience of changes made in the fundamental law. Nevertheless, the power to ascertain the validity of changes in the Constitution resides in the courts, and they have, with practical uniformity, exercised the authority to determine the validity of proposal, submission, or ratification of change in the organic law. Consequently, the judicial department of the government invariably has the right to consider whether the legislative department and its agencies have observed constitutional requirements in attempting to amend the Constitution and may set aside their acts in case they have not done so. When a constitutional amendment has been submitted, the single inquiry for the courts is whether the fundamental law has been complied with and whether the amendment has received the sanction of the popular approval in the prescribed manner.”
 

 See, to the same effect, 16 C.J.S., Constitutional ' Law, §§
 
 7
 
 and 146, where the question is discussed at length.
 

 In Volume-6, page 908, Second Edition of the American and English Encyclopedia of Law, it is said: “The courts have full power to declare that an amendment to the constitution has not been properly adopted, even .though it has been so declared by the political department of the state.” Numerous authorities are cited in support of the statement.
 

 The editors of the Lawyers’ Reports Annotated, in the note appended to the case of Miller v. Johnson, 15 L.R.A. 524, declared that the question of lawful adoption of an amendment to the constitution is a judicial question.
 

 In State ex rel. Morris v. Mason, Secretary of State, 43 La.Ann. 590, 9 So. 776, this Court, as well as the district court for the Parish of East Baton Rouge, entertained jurisdiction of a case where the question involved required a judicial interpretation of Article 256 of the Constitution of 1879. The constitutional article in the Mason case was similar to, if not identical with, Article 21 of the Constitution of 1921, prescribing the method by which that Constitution may be amended.
 

 Counsel for relators, in support of their contention, have cited many old cases, including State ex rel. Oliver v. Warmouth, 22 La.Ann. 1, 2 Am.Rep. 712, and State ex rel. Mississippi Valley Navigation Company v. Warmouth, 24 La.Ann. 351, 13 Am.Rep. 126, with respect to writs of mandamus and injunction against the Governor or other executive officers. But an examination of the decision of this Court in State ex rel. Brenner v. Noe, 186 La. 102, 171 So. 708, shows that those cases were expressly overruled.
 

 Counsel for relators * also have cited a number of cases from this and other jurisdictions which have no bearing on the issue presently before the Court, and we shall therefore not discuss them.
 

 
 *530
 
 (2) The exception to tbe jurisdiction of the court ratione personae is predicated on the failure or omission of counsel for respondents to allege that the relators, the State Auditor and the State Treasurer, have their offices and domiciles in the Parish of East Baton Rouge, where the suit was originally filed.
 

 The relators do not deny that L. B. Baynard, the State Auditor, and A. P. Tug-well, the State Treasurer, reside and maintain their offices in the Parish of East Baton Rouge. As shown by the prayer of the petition, Mr. Tugwell and Mr. Baynard were sued in their official capacities only. The trial judge was of the opinion that the defect, if any, was cured by the allegations contained in the prayer of the petition. Moreover, the trial judge took judicial notice of the fact that the domiciles of the State Auditor and the State Treasurer are in the Parish of East Baton Rouge.
 

 The cases of State ex rel. Navo v. Baynard, State Auditor, 176 La. 520, 146 So. 41, and State ex rel. Violet Trapping Co., Inc., v. Grace, Register of the State Land Office, 182 La. 405, 162 So. 26, support the proposition that the Nineteenth Judicial District Court for the Parish of East Baton Rouge was vested with original jurisdiction of this case.
 

 We find no error in the ruling of the trial judge.
 

 (3) The exception of no cause of action involves the question of the constitutionality of Act 384 of 1940, which was considered by the trial judge in connection with the hearing on the merits of the rule to show cause whv a preliminary injunction should not issue. We shall discuss the question in reviewing the action of the trial judge in granting the preliminary injunction.
 

 (4)Under the exception of no right of action and want of interest in the respondents, counsel for relators challenge the right of respondents, as mere taxpayers, to attack the constitutionality of Act 384 of 1940. We can not assent to the proposition that those who pay the taxes' are without right to question the manner in which the taxes are expended by public officials.
 

 Whatever may have been the effect of the former jurisprudence of this State, as reflected in Moss v. Hall, 133 La. 351, 63 So. 45, and Sutton v. Buie, 136 La. 234, 66 So. 956, L.R.A.1915D, 178, in denying a taxpayer the right to enjoin a state official from disposing of state funds under an unconstitutional act, it is now well settled that a taxpayer does have that right.
 

 In Donaldson v. Police Jury, 161 La. 471, 109 So. 34, this Court, on rehearing, expressly decided that a taxpayer might resort to judicial authority to restrain public servants from transcending their lawful powers or violating their legal duty in any unauthorized mode which would increase the burden of taxation or otherwise unjustly affect the taxpayer or his property. The fact that the taxpayer’s interest might be small and not susceptible of accurate determination is not sufficient to deprive him of the right. The action is regarded as having a public character, and as being a proceeding in which the public complains.
 

 In the case of Borden v. Louisiana Board of Education, 168 La. 1005, 123 So. 655,
 
 *532
 
 67 A.L.R. 1183, this Court, affirming the holding in the Donaldson case, recognized the right of a taxpayer to sue to prevent the alleged illegal expenditure of public funds. The decision in the Borden case, in effect, overrules the jurisprudence as expressed in the cases of Moss v. Hall and Sutton v. Buie.
 

 [7] The law as it is presently applied in this State is not unlike that of many other jurisdictions on this point, as will appear by reference to 16 C.J.S., Constitutional Law, § 80, where the textwriter has this to say: “A taxpayer may, generally, attack the validity of a statute which affects him injuriously. Thus he may attack a statute which authorizes the expenditure of public funds, or prescribes the legislative procedure for the enactment of appropriations, or exempts persons or property from taxation, or imposes on him in its enforcement an additional financial burden, however slight.”
 

 [8] In Hall v. Blan, State Treasurer, 227 Ala. 64, 148 So. 601, 607, the Court announced the rule in the following words: “A taxpayer may maintain a suit to enjoin the state treasurer from diverting public funds, or disbursing same for unlawful purposes. He has a direct interest in seeing that taxes paid are devoted to the ends provided by law. While early decisions in some states sought to differentiate between state and county officers in such suits, the great weight of authority now recognizes this remedy. See extended note reviewing authorities in 58 A.L.R. page 589. A later case is found in Borden et al. v. Louisiana State Board of Education et al., 168 La. 1005, 123 So. 655, 67 A.L.R. 1183.”
 

 The original petition filed by respondents in the district court sets forth that petitioners possess certain rights, privileges and immunities guaranteed by the State and Federal Constitutions; that they can not be deprived of those rights and privileges except by due process of law; and that they have instituted this suit distinctly and solely in the quality and capacity of citizens and taxpayers to contest the expenditure of funds of the State under the alleged unconstitutional proposition, submitted to the voters on November 5, 1940, as the proposed constitutional amendment No. 3, Act 384 of 1940. Petitioners allege that unless the proposition is declared unconstitutional, they will suffer irreparable injury, and they set forth the nature and extent of the alleged injury.
 

 It is asserted in one of the many briefs filed on behalf of the relators that this suit is brought by persons who are neither citizens nor taxpayers of this State, in fact, by persons who are aliens, and therefore who can suffer no injury and no damage either in their persons or in their property, regardless of whether the reorganization amendment is constitutional or unconstitutional. We are at a loss to follow the reasoning underlying this assertion.
 

 [9] The respondents, in the beginning of their original petition, allege that they are residents of the Parish of East Baton Rouge, are qualified electors of that parish, and own both real and personal property in this State. Relators filed a number
 
 *534
 
 of exceptions to the petition without objecting to respondents’ capacity to file this suit and stand in judgment. On the trial of the rule nisi for a preliminary injunction in the district court, certificates of the deputy assessor and the deputy sheriff and tax collector were filed in the record and the testimony of those officials was taken in connection with their certificates. The certificates and the accompanying testimony show beyond contradiction that all the plaintiffs are property owners and taxpayers of the Parish of East Baton Rouge. Therefore, it sufficiently appears that respondents are citizens and taxpayers of this State. There is nothing in the record which justifies the characterization of respondents either as nonresidents or as aliens, who pay no taxes in this State.
 

 The exception of no right of action and want of interest in the respondents is not well founded and was properly overruled by the trial judge.
 

 We shall now proceed to dispose of the case on the merits and on the exception of no cause of action which is involved in the merits.
 

 Act 384 of 1940 consists of a joint resolution adopted by the Legislature proposing to amend the Constitution of this State in a number of important particulars. The legislative resolution was submitted to the voters of the State at an election held on November 5, 1940, as the proposed constitutional amendment No. 3, or Act 384 of 1940. According to the returns of the election, 274,419 votes were cast on the proposition. Of this number 140,543 votes were reported as approving the proposition and 133,876 votes were reported as disapproving the proposition, or a majority of 6,667 in its favor.
 

 Plaintiffs allege in their petition that Act 384 of 1940 is unconstitutional on the following grounds:
 

 (1) That the statute is violative of the fundamental' principles of a republican form of government as provided by the Constitution of this State and by section 4 of Article 4 of the Constitution of the United States, “because it is arbitrary, undemocratic, and denies and limits petitioners’ voice in the election of public officials directly responsible to the electorate and places unlimited centralized power in the Governor of Louisiana without dire process of law.”
 

 (2) That the statute is violative of the requirement of section 1 of Article 21 of the Constitution of this State reading as ■follows: “The Legislature shall designate the election at which the said amendment or amendments shall be submitted to the electors for their approval or rejection.”
 

 (3) That the statute is violative of the requirement of section 1 of Article 21 of the Constitution of this State reading as follows: “When more than one .amendment shall be submitted at the same election, they shall be so submitted as to enable the electors to vote on each amendment separately.”
 

 The first ground of objection is not argued by counsel for respondents. For our own part, we are unable to see any merit in the contention. According to the authorities, the enforcement of the provi
 
 *536
 
 sions of the Federal Constitution guaranteeing every state a republican form of government is of a political character over which the courts have no jurisdiction. Luther v. Borden, 7 How. 1, 48 U.S. 1, 12 L.Ed. 581; Pacific States Telephone & Telegraph Company v. Oregon, 223 U.S. 118, 32 S.Ct. 224, 56 L.Ed. 377; and Coleman v. Miller, 307 U.S. 433, 59 S.Ct. 972, 83 L.Ed. 1385, 122 A.L.R. 695. We shall therefore pretermit any further discussion of the question. In so doing, however, we deem it pertinent to refer to a statement of Chief Justice Fuller in Duncan v. McCall, 139 U.S. 449, 11 S.Ct. 573, 577, 35 L.Ed. 219. The statement follows:
 

 “By the constitution, a republican form of government is guarantied to every state in the Union, and the distinguishing feature of that form is the right of the people to choose their own officers for governmental administration, and pass their own laws in virtue of the legislative power reposed in representative bodies, whose legitimate acts may be said to be those of the people themselves; but, while the people are thus the source of political power, their governments, national and state, have been limited by written constitutions, and they have themselves thereby set bounds to their own power, as against the sudden impulses of mere majorities.”
 

 Taking up the second ground of objection, we find from an examination of the text of Act 384 of 1940 that the Legislature failed to designate the election at which the proposed amendment should be submitted to the voters for their approval or disapproval. Act 384 of 1940 was the only one of a group of twenty-eight constitutional amendments proposed by the session of 1940 in which the Legislature failed to fix the date for voting on the amendment as required by section 1 of Article 21 of the State Constitution.
 

 The Secretary of State, who was called as a witness by respondents, testified that the Legislature did not designate the date of the election, but that Act 384 of 1940 came to his office, together with the other twenty-seven amendments; that as required by the Constitution, he caused to be published all the proposed amendments, and that the publication showed that the proposed amendments “would be voted upon at the general election to be held on November 5, 1940.”
 

 In these circumstances, respondents contend that the Secretary of State and not the Legislature fixed the date of the election at which the electors voted for and against the proposed amendment embodied in Act 384 of 1940.
 

 The constitutional article provides that the Legislature “shall designate the election at which the * * * amendment * * * shall be submitted to the electors for their approval or rejection.” Respondents argue that the language quoted is mandatory and not directory. Respondents say that when the Legislature in proposing Act 384 of 1940, failed to designate an election at which the proposal was to be acted upon, the effect of the omission was to invalidate the proposed amendment, since neither the Secretary of State nor any other officer was vested with the authority to cause the proposed amendment to be submitted
 
 *538
 
 to the voters at the election held on November 5, 1940, or at any other election.
 

 The relators do not dispute, and can not dispute, the correctness of respondents’ contention that the Legislature did not designate the election at which the proposals contained in Act 384 of 1940 should •be submitted to the voters for their approval or rejection. In defense of the omission of this constitutional requirement, relators argue that the duty imposed upon the Legislature by the Constitution to designate the election at which proposals for its amendment should be submitted to the voters relates to a matter of form and not of substance; that although no formal words directing .the submission of the amendment to the voters are found in the legislative act, nevertheless it must be presumed that the Legislature intended to do its duty and to submit the amendment to the voters at the election of November 5, 1940; that it was the ministerial duty of the Secretary of State to advertise and submit the proposal'at the ensuing election for representatives, and, finally, that the voters approved the proposal and thereby cured all its defects.
 

 The argument of relators seems to be self-contradictory. They admit that it was the duty of the Legislature to designate the election at which the proposal should be submitted, and yet they urge the Court to assume that the duty was performed, because the Legislature must be presumed to intend to do its duty. -We fail to see how the presumption invoked by relators can be accepted in view of the fact that the Legislature in twenty-seven other proposed amendments, in obedience to the constitutional requirement, expressly designated the date of the election at which the proposals were to be submitted to the people, while in the case of this particular amendment — apparently the most important of all the proposed amendments — in utter disregard of the constitutional requirement, the date of the election was entirely omitted. Why this was done is left purely to conjecture, since the record is silent on the point. But whether the omission was intentional or accidental, the fact remains that the Legislature, in submitting its proposal, failed to follow one of the mandatory requirements of the Constitution.
 

 Relators’ suggestion that the nonperformance of the legislative duty was immaterial, because it relates only to a matter of form, is not impressive. The defect is substantial. It results from the failure of the Legislature to observe one of the requirements demanded by the Constitution itself.
 

 Relators say that it was the ministerial duty of the Secretary of State to submit the proposal to the voters at the election on November 5, 1940. However, they do not attempt to explain why the constitutional provision, which they say is binding on the Secretary of State, is less binding on the Legislature. Nor can we understand upon what theory, either of law or logic, they can maintain a proposition which leads to the absurd conclusion that where the Constitution imposes certain duties upon two distinct agencies, one of these agencies may take upon itself the duty of perform
 
 *540
 
 ing an act which the Constitution expressly places upon the othef.
 

 The obligation of designating the election at which the proposed amendment to the Constitution shall be submitted to the voters is specifically and clearly imposed upon the Legislature by the Constitution itself, thus making the obligation a purely legislative function. The argument that the Secretary of State, an officer of the Executive Department, may validly usurp the functions belonging exclusively to the Legislative Department ignores the prohibition embraced in section 2 of Article 2 of the Constitution that no officer in the Executive Department shall exercise any power properly belonging to the Legislative Department.
 

 • ' [15] Article 21 of the Constitution does not expressly or impliedly authorize the Secretary of State to designate or choose the date of the election at which amendments shall be submitted to the voters. This article prescribes no duty whatever with' respect to placing the proposal upon the ballot, either by the Secretary of State or any one else. The only reference to the Secretary of State in the entire article appears in these words: “ * * * the Secretary of State shall cause the same [the proposal] to be published, in one newspaper in each parish of the State in which a newspaper is published, twice within not less than thirty nor more than sixty days preceding an election for Representative in the Legislature or in Congress.” Then follows these words: “The Legislature shall designate the election at which said amendment or amendments shall be submitted to the electors for their approval or rejection.”
 

 It requires no extensive argument to support the proposition that if it were the intention of the framers of the Constitution to permit the Secretary of State to choose the date of the election, or to require that the election should be held at a subsequent election for representatives in the Legislature or in Congress, they would have so provided. But they did not do this. After prescribing the duty of the Secretary of State with respect to the publication of the proposed amendment, they specifically provided that the Legislature itself should designate the election at which the amendment or amendments should be submitted to. the. voters. In discharging its obligation to designate the election, the Legislature is not restricted to the subsequent, or to any other election for representatives in the Legislature or in Congress, but it is vested with .full discretion to select the date which, in its wisdom, seems the most convenient and appropriate for that purpose.
 

 There is no merit in relators” contention that, under the mandatory provisions of the Constitution, the Secretary of State is bound and obligated to advertise and place upon the ballot the proposed amendment at the ensuing election for representatives, which was the election held on. November 5, 1940. On the contrary, under the mandatory provisions of the Constitution, the Legislature itself was obligated to. designate the date of the election at which the proposed amendment should be submitted to the voters, and, having failed to comply with this obligation, no officer irt
 
 *542
 
 the Executive Department, nor any other person could constitutionally usurp the power delegated by the people to the Legislature alone, by substituting himself for the chosen representative of the people.
 

 It is well settled that regulatory provisions as to the time for submission of proposed constitutional amendments are mandatory and must be complied with. The general rule is set forth in 16 C.J.S., Constitutional Law, § 9(2), page 42, in these words:
 

 “Generally, the time of submission of proposed amendments is fixed by legislative or constitutional provisions; and a provision to the effect that amendments may be submitted only at certain times, or at certain elections, are [sic] mandatory and must be complied with, and a failure to do so serves to invalidate the amendment.”
 

 In Johnson v. Craft, 205 Ala. 386, 87 So. 375, the Supreme Court of Alabama had before it a case in which the Legislature in proposing a constitutional amendment undertook to delegate to the Governor the power to fix the date on which the election should be held, although the constitution itself provided that the Legislature should -order elections upon proposed constitutional amendments to be held either at the general election next succeeding the session of the Legislature at which the amendment is proposed, or upon another day appointed by the Legislature not less than three months after the final adjournment of the legislative session. The Court held that this ■could not be done; that the Legislature was without power to delegate the fixing of the date of the election to the Governor of the State. The Court, in holding that the proposed constitutional amendment was-invalid because the Legislature had failed to fix the date of the election as required by the constitution, also expressly held that such failure was not cured by the lapse of time,’ by the favorable vote of those participating in the election, or by any action taken under the proposed amendment. Incidentally, a taxpayer was the plaintiff in' the case. The Court reaffirmed the doctrine of Collier v. Frierson, 24 Ala. 100, which appears to be the most frequently cited case in American jurisprudence on this particular point of constitutional law.
 

 In disposing of the issue, Justice McClellan, speaking for the Supreme Court of Alabama, remarked [205 Ala. 386, 87 So. 380]:
 

 “Upwards of 60 years ago this court had occasion to consider and to pronounce constitutional principles referable to the change by amendment of the organic law. The opinion then delivered by Justice Goldthwaite established Collier v. Frierson, 24 Ala. 100, as a leading authority in our country on the subject under consideration. Many courts of the highest repute, as well as text-writers, have accorded the doctrine there announced the unreserved acceptance its obvious soundness deserves, and have given that pronouncement its own great place in the constitutional jurisprudence of the republic.”
 

 Justice McClellan quoted approvingly from the decision in Collier v. Frierson as follows:
 

 “We entertain no doubt, that, to change the constitution in any other mode than by
 
 *544
 
 a convention, every requisition which is demanded by the instrument itself must be observed, and the omission of any one is fatal to the amendment.' We scarcely deem any argument necessary to enforce this proposition. The Constitution is the supreme and paramount law. The mode by which amendments are to be made under it is clearly defined. It has been said that certain acts are to be done, certain requisitions are to be observed, before a change can be effected. But to what purpose are these acts required, or these requisitions enjoined, if the Legislature, or any other ' department of the government, can dispense with them. To do so would be to violate the instrument which they are sworn to support, and every principle of public law and sound constitutional policy requires the courts to pronounce against every amendment, which is shown not to have been made in accordance with the rules prescribed by the fundamental law.”
 

 The decision in Johnson v. Craft contains a complete review and analysis of the constitutional question involved.
 

 In the later case of Hooper v. State, 206 Ala. 371, 89 So. 593, the legal principles announced in Johnson v. Craft were approved and adopted. • In the Hooper case, a constitutional amendment proposing to exempt soldiers and sailors from the payment of poll taxes was declared invalid because the Legislature, instead of appointing the day on which the election should be held as required by the Constitution, delegated that duty to the Governor. The Court held this was so, notwithstanding the amendment had received a favorable vote at the election called by the Governor and that the soldiers and sailors had actually received the benefit of the exemption voted.
 

 In the case of State v. State Board of Equalization, 107 Okl. 118, 230 P. 743, the Supreme Court of Oklahoma held that an election in which a proposed amendment to the constitution had been approved by a majority of the voters had no legal force and effect, because it had not been properly ordered in accordance with the provision of the constitution. It appears that, under the constitution of Oklahoma, 'if an amendment, to the constitution is agreed to by a majority of the members of the Legislature, the amendment, with the yeas and nays thereon, should be entered in the legislative journals and referred by the Secretary of State to the people for their approval or rejection, at the next regular general election, except when the Legislature, by a two-thirds vote of each house, shall order a special election for that purpose. It was held that under this provision, although a majority of the members elected to each house of the Legislature agreed to the amendment, two-thirds of the membership had not ordered the amendment submitted at a special election. It being conceded that the election at which the amendment was submitted was a special election, the Court held there was no authority of law for submitting the amendment at the election and that the affirmative vote of the people thereon did not cure the defect.
 

 Counsel for the relators, in support of their argument on this ground of objection to the constitutionality of Act 384 of 1940, cite the case of Saunders v. Board of Liq
 
 *546
 
 uidation of City Debt, 110 La. 313, 314, 34 So. 457. But that case is not authority for the proposition presently under discussion. An examination of the decision shows that the Legislature in proposing the constitutional amendment (Act 4 of 1899, Ex. Sess.), which was under consideration in that case, expressly provided that it should be submitted “to the electors of the State at the next general election for representatives in the Legislature, to be holden on the Tuesday next following the third Monday in April, A. D., 1900 * *
 

 Counsel for relators also cite four cases decided by the Supreme Court of Pennsylvania, to-wit: Armstrong v. King, 281 Pa. 207, 126 A. 263; Hollinger v. King, 282 Pa. 157, 127 A. 462; Taylor v. King, 284 Pa. 235, 130 A. 407, 408; and Ruler v. York County, 290 Pa. 427, 139 A. 136, 138.
 

 Counsel for relators, in their brief, repeat certain language contained in the decision in Taylor v. King which is excerpted •from the case of Armstrong v. King, to the effect that, although there may be a technical error in the manner in which a proposed amendment is adopted or advertised, yet if the amendment, unobjected to, be approved by the electors, it becomes a part of the constitution.
 

 We have carefully read the cases cited. In using the language referred to by relators the authors of the opinions in both cases were merely indulging in a generality that had no actual bearing on the issues involved. The statements were pure obiter.
 

 In Armstrong v. King [281 Pa. 207, 126 A. 264], the court had under consideration a proposed amendment to the Constitution of Pennsylvania which was attacked on the ground that it violated a portion of that constitution providing that “no amendment or amendments shall be submitted oftener than once in five years.” The court enjoined the secretary of the commonwealth from advertising the amendment for submission to the voters on the ground that it was violative of the quoted provision of the constitution. The court held that there was no doubt whatever as to the usual meaning of the constitutional prohibition and that contemporaneous and long-continued uniform interpretation of the provision by the Legislature and the state officials could not be invoked to give it a different meaning.
 

 Taylor v. King is authority for the proposition that where the Legislature, after complying with constitutional requirements, proposed an amendment to the Constitution, it was the constitutional duty of the Secretary of State to advertise the proposal, and if he improperly refused to do so through the result of a misunderstanding as to his duty, the courts would require by mandamus that the duty be performed though it should be necessary, because of delay, to hold another election at a time later than that designated by the Legislature.
 

 In Hollinger v. King, plaintiff filed a bill in equity to enjoin a certain state agency from purchasing part of a large bond issue, which the Governor proposed to sell under the provisions of a certain legislative act. The suit was to have the act declared invalid as a violation of Article 9, section 5, of the Constitution of Pennsylvania, P.S.,
 
 *548
 
 and also to have the amendment to section 4 of Article 9 of the Constitution, P.S., under the provisions of which the bond issue was proposed to be made, declared illegal and void. The court enjoined the issuance of the bonds because no act of the Legislature had been passed authorizing the borrowing of the money and specifying the purpose for which it was to be used as required by section 5 of Article 9 of the Constitution. Incidentally, the court sustained the validity of the amendment to section 4 of Article 9 of the Constitution, which apparently was attacked on the ground that it was submitted in a year, 1923, when such actions were forbidden by the organic law. Just what this prohibition was is not explained in the opinion.
 

 In Ruler v. York County, a taxpayer of York County challenged the right of the county to issue the necessary bonds to raise its share of the money required to build an intercounty bridge across the Susquehanna River between the counties of Lancaster and York. There were three grounds of challenge, neither one of which involved a question as to the date of the election at which the voters approved the project of building the bridge.
 

 There are a number of other cases cited in the briefs filed on behalf of the relators, but none of them have any bearing on the proposition we are now discussing.
 

 This brings us to the consideration of the third ground of objection urged by respondents to Act 384 of 1940, that the statute violates the requirement of section 1 of Article 21 of the Constitution providing that: “When more than one amendment shall be submitted at the same election, they shall be so submitted as to enable the electors to vote on each amendment separately.”
 

 Relators argue that there is no force in respondents’ objection, because Act 384 of 1940 represents a comprehensive plan for reorganizing the Executive Department of the State government, and therefore its submission as a single amendment was in full compliance with the constitutional requirement.
 

 It requires no argument, nor. citation of authorities to support the proposition that if the changes contained in the proposed amendment may be logically viewed as parts of a single plan then their submission as one amendment meets the constitutional requirement. But does Act 384 of 1940 fall within this well recognized rule? That is the question presented for decision. A proper understanding of the question can only be had by examining the provisions of the proposed amendment in the light of the constitutional provision which respondents claim its submission, in its present form, violates.
 

 In State ex rel. Morris v. Mason, Secretary of State, 43 La.Ann. 590, 9 So. 776, it was held, as shown by paragraph seven of the syllabus by the Courtj that: “Whether a proposed amendment contains provisions which cannot be submitted as one amendment must be construed and determined by a comparison thereof with the one-object article of the Constitution,” which was the article in the Constitution of 1879 providing that every law enacted by
 
 *550
 
 the Legislature shall express but one object.
 

 In submitting Act 384 of 1940 to this test, we are first confronted with its title, which specifically points out the plural character of the proposed changes in the fundamental law. The title of the statute reads in part: “Proposing amendments to the Constitution of Louisiana, relative to the form of organization of the Executive Department of the State government and a unified and comprehensive system of financial administration, by articles and sections as follows: * *
 

 It will be readily observed that according to the title of Act 384 of 1940, the text thereof is to embrace
 
 proposed amendments
 
 and not merely
 
 one proposed amendment
 
 to the Constitution. The title of the statute also discloses that the object of the proposed amendments is to change not only the form of the State government, but also to establish a new system of financial administration.
 

 It is true that, unlike a legislative act, it is not required that a title should precede a proposed amendment to the Constitution, nevertheless, there is no legal- reason why it should not be given a title for identification and verification for the purpose of legislative action. It was so held in Saunders v. Board of Liquidation, 110 La. 313, at page 331, 34 So. 457, at pag;e 464, in which case, the Court set forth its holding as follows:
 

 “It is said that a title to an article amending a Constitution is a thing neither recognized nor required by law; that a title to an amendment would be entirely out of place. This may be true as to the form in which it should be submitted to the people for their vote at the polls, and also as to the form in which it should be made to appear when adopted; but no good reason can be assigned why the General Assembly should not, for the purposes of its own action or legislation, attach some designation to a bill Or joint resolution proposing an amendment for the purposes of identification and reference. While a title might not be required, there is no reason why, if attached, it should not be utilized in connection with the proposition for an amendment for the purposes of the General Assembly itself.”
 

 In Townsend v. Smith, 144 Ga. 792, 87 S.E. 1039, the Supreme Court of Georgia held that while a proposal by the Legislature of an amendment to the Constitution does not require a title, yet when the proposal is in the form of an act having a caption, it is legitimate to look to the caption as a means of construing the proposed amendment.
 

 In State v. O’Connor, 81 Minn. 79, 83 N.W. 498, the Supreme Court of Minnesota held that although a title to an act of the Legislature proposing an amendment to the Constitution is not necessary to the validity of the act, nevertheless the title may be looked to when construing and interpreting the section of the Constitution to which it relates. In so holding, the Court stated that this was the universal rule and that the rule applies where no title is required. A number of authorities are cited by the court in support of its statement.
 

 
 *552
 
 [24] In view of these considerations and since the Legislature, although not required to do so, saw fit to attach a title to Act 384 of 1940, we see no reason why the title may not he referred to in order to ascertain generally the scope and object of the proposed changes in the Constitution.
 

 The wording of the title is not only in the plural, but the wording appearing on the official ballot concerning Amendment
 
 No. 3 is
 
 also in the plural. The wording is as follows:
 

 ‘‘For the proposed amendment to Article III, V, VI, VI-A, X, and XVI-A relative to the form of organization of the Executive Department of State government, and a unified and comprehensive system of financial administration.
 

 “Against the proposed amendment to Article III, V, VI, VI-A, X, and XVI-A relative to the form of organization of the Executive Department of State government, and a unified comprehensive system of financial administration.”
 

 While the form of the ballot does not limit the extent of a proposed constitutional amendment, it is significant that the form of the ballot prescribed in the proposed Amendment No. 3 (Act 384 of 1940), in line with the express language of the title of the Act, shows that the proposed amendment embraces more than one obj ect. The proposed amendment itself indicates that it was intended to provide, and it does provide, in the language of relators, for the adoption of an Administrative Code (Act
 
 47
 
 of 1940) and a Fiscal Code (Act 48 of 1940).
 

 [25] In order to ascertain whether the provisions contained in the body of Act 384 of 1940 violate the constitutional prohibition against submitting more than one amendment in the same proposal, necessarily the entire text of the statute must be considered.
 

 [26] After analyzing the holdings in a number of earlier cases, Judge Lockwood, speaking for the Supreme Court of Arizona, in the case of Kerby v. Luhrs, 44 Ariz. 208, 36 P.2d 549, 554, 94 A.L.R. 1502, lays down the rule to be applied whether one or more than one constitutional amendment is covered by a proposition submitted, as follows:
 

 “If the different changes contained in the proposed amendment all cover matters necessary to be dealt with in some manner, in order that the Constitution, as amended, shall constitute a consistent and workable whole on the general topic embraced in that part which is amended, and if, logically speaking, they should stand or fall as a whole, then there is but one amendment submitted. But, if any one of the propositions, although not directly contradicting ■the others, does not refer to such matters, or if it is not such that the voter supporting it would reasonably be expected to support the principle of the others, then there are in reality two or more amendments to be submitted, and the proposed amendment falls within the constitutional prohibition. Nor does the rule as stated unduly hamper the adoption of legitimate amendments to the Constitution. Such a document was presumably adopted deliberately, after careful preparation, as a harmonious and com
 
 *554
 
 píete system of government. Changes suggested thereto should represent the free .and mature judgment of the electors, so submitted that they cannot be constrained to adopt measures of which in reality they disapprove, in order to secure the enactment of others they earnestly desire.”
 

 The rule, as stated by Judge Lockwood, represents a clarification of the test laid down in the case of State v. Timme, 54 Wis. 318, 11 N.W. 785, which is referred to in State v. Mason, supra, and is strongly relied on by relators in this case.
 

 In Kerby v. Luhrs, a proposed constitutional amendment,
 
 although dealing with the general subject of taxation,
 
 was said to be logrolling of the worse type and to violate both the spirit and letter of the constitution, where it contained three distinct propositions, no two of which were necessarily required for the proper operation of the third,' namely, a proposition in regard to the method in which copper mines should be taxed, a provision in regard to the method of taxing public utility corporations, and a provision establishing a tax commission as a constitutional body which, in fact, would be independent of the regular executive and legislative, and, perhaps, of the judicial branches of the State government.
 

 ■ One of the cases referred to in Kerby v. Luhrs is McBee v. Brady, 15 Idaho 761, 100 P. 97, 101. There the Supreme Court of Idaho, citing ample authority in support of the ruling, held that a constitutional provision requiring that where two or more amendments are proposed, they shall be submitted in such manner that the electors shall vote for or against each of them separately, is mandatory. The Court, in discussing the constitutional requirement and the duty of the Legislature to comply therewith, made the following pertinent observation :
 

 “This provision of the Constitution is a wise one, and is intended to. prevent several inconsistent and conflicting propositions from being submitted to the voters in the same amendment, and forcing the voter to approve or reject such amendment as a whole. In other words, it prevents burdening a meritorious proposition with a vicious one, and alike prevents a vicious proposition from having the support of a meritorious one, and gives to the voter the right to have each separate proposition submitted to him in order that he may express his will for or against each separately without being compelled to accept a provision to which he is opposed in order to have adopted a provision which meets his favor.”
 

 The amendment under review in McBee v. Brady provided for the repeal of two, and the amendment of five, sections of the Constitution, submitting five propositions, namely, to abolish the probate Court and extend the jurisdiction of the district court to all matters of probate, to provide for the election and appointment of judges, to provide for the salaries of judges, to provide for the terms of the courts, and a system of districts. The Court held that the propositions could not be submitted constitutionally to the electors as one amendment.
 

 In Jones v. McClaughry, 169 Iowa 281, 151 N.W. 210, 216, the Supreme Court of Iowa explained the purpose of a constitu
 
 *556
 
 tional requirement that when more than one amendment shall he submitted at the same election, they shall be so submitted as to enable the electors to vote on each amendment separately. The Court stated that the purpose of such a constitutional requirement was “to exact the submission of each amendment upon its merits alone, and thereby secure the free and independent expression of the will of the people thereon. Incongruous matter and that having no connection with the main subject is excluded, and the evil of loading a meritorious proposition with another of doubtful propriety obviated. The elector in approving or rejecting cannot be put in a position where he may be compelled, in order to aid in carrying a proposition, also to vote for another which, if separately submitted, he would reject.”
 

 Numerous cases from other jurisdictions are cited on behalf of relators in which the general rule has been laid down that a constitutional amendment embracing several subjects all of which are germane to the general subject of the amendment, under the requirement for separate submission where more than one amendment is proposed, may be submitted to people as a general proposition.
 

 The question in this case is not whether the rule is sound, but whether it is applicable to the proposed amendment under review by the Court.
 

 From our own jurisprudence, counsel for relators have selected as cases in point, State v. Mason, 43 La.Ann. 590, 9 So. 776 ; State v. Favre, 51 La.Ann. 434, 25 So. 93; and Guillory v. Jones, 197 La. 165, 1 So. 2d 65.
 

 In the Mason case, a constitutional' amendment having for its one object the-extension of a lottery contract for a primary term of twenty-five years, the consideration therefor to be applied to various, enumerated objects, was upheld as having a single object. The suit was for a man-damus to compel the secretary of state to.-publish the proposed amendment. In a court, composed of the Chief Justice and' four Associate Justices, there were two* concurring and two dissenting opinions. As pointed out in East Jefferson Waterworks District v. Caldwell & Co., 170 La. 326, 120 So. 739, the suit was filed and decided at a time of widespread political excitement in the State. In the Favre case the defendant, indicted for murder, attacked as illegal the Constitution of 1898; on the ground that the instrument framed by the Constitutional Convention of 1898 was a mere amendment to the Constitution of 1879, which had not been submitted to the people for ratification or rejection; The Court held that there was no basis for the attack on the Constitution of 1898; that in its opinion the instrument was exactly what it purports to be, the Constitution; and not an amendment to an existing constitution. In the Guillory case, the proposed changes referred only to a single section and a single article of the Constitur tion.
 

 Neither in the Mason case nor in the Favre case, nor in the Guillory case, nor in any other case to which we have been referred, has this Court, or any other.
 
 *558
 
 ■court, construed the constitutional provision requiring that “when more than- one amendment shall be submitted at the same •election, they shall be so submitted as to enable the electors to vote on each amendment separately,” to mean that the Legislature may submit to the people, under the guise of one amendment, a group of amendments bearing no relation to one another and proposing wholly different objects and purposes.
 

 An analysis of the provisions of Act 384 of 1940 shows that the act embodies a plurality of objects and purposes. It affects six articles of the Constitution by repealing twenty sections, amending and rewriting eight sections, and adding seventeen new sections.
 

 The twenty articles which_ the legislative act proposes to repeal are referred to merely by numbers, no indication whatever being given as to what the articles cover. Reference to the Constitution itself discloses that three of these sections are in Article III governing the Legislative Department; five of the sections are in Article VI covering Administrative Offices and Boards; one of the sections is Article VI-A relating to Gasoline Taxes and the Distribution of the Proceeds; and ten sections are in and ■constitute the whole of Article XVI-A relating to the reparation claims connected with the Caernarvon Levee Break in St. Barnard Parish; four of the proposed new sections are in Article III, the Legislative Department; nine are in Article V, relating to the Executive Department; and four are in Article VI-A. Of the rewritten sections, three are in Article V; three are in Article VI, one in Article VI-A and one is in Article X relating to Revenue and Taxation.
 

 Generally speaking, Act 384 of 1940 proposes amendments relative to the form of organization of the executive Department and a unified and comprehensive system of financial administration, that is to say, it provides for the adoption of an administrative and a financial code in violation of the constitutional provision embodied in section 18 of Article 3 against the Legislature adopting any code of laws by general reference to such code.
 

 The proposal embraces an executive cabinet, military affairs, conservation, public works, public safety, public welfare, public service, public education, highways, health, banking, labor, agriculture, occupational standards, state lands, state records, financing, accounting, taxation, state institutions, and other subjects.
 

 Specifically speaking, it abolishes the Legislative Bureau, which is an aid to the Legislature and wholly disconnected with the operation of the Executive Department. It makes the Lieutenant Governor and the State Auditor members of the Legislative Department.
 

 The first part of Act 384 of 1940 appearing in the printed volume of the Acts of 1940, on page 1431, and subsequent pages, up to and including the repeal of section 12 of Article VI-A on page 1440, deals exclusively with the reorganization of the Executive Department of the State, and the remaining part of Act 384 of 1940, appearing in the printed Acts of 1940
 
 *560
 
 from page 1440 to the end of the act, deals exclusively with the State’s system of financial administration. That these propositions involve distinct objects is amply shown by the language used in the proposal itself.
 

 It is significant that section 29, which is a new section added to Article V of the Constitution, provides for the ratification and validating of any law adopted at the legislative session to be held in 1940, the purpose or effect of which is to provide for the plan of reorganization as required by the proposal, and that section 18, which is a new section added to Article VI-A of the Constitution, provides for the ratification and validating of any law to be adopted at the legislative session of 1940 affecting the financial system of the State. Manifestly, if its framers considered that the proposal embraces but one subject, they would not have written into the proposal two articles providing for the ratification in advance of any legislative act relating to that subject when only one such provision would have accomplished that purpose. Furthermore, it required two separate and distinct acts of the Legislature to carry out the provisions of the proposed amendment. Act 47 of 1940, which in its first section, declares that it was to be known as “the ‘Administrative Code of 1940,’ ” was enacted for the purpose of reorganizing the Executive Department of the State. Act 48 of 1940, which in its first section, declares that it shall be known as “The Fiscal Code of 1940,” provides for a unified and comprehensive system of financial administration. Nothing is said in Act 47 of 1940 about a unified and comprehensive system of financial administration. Nothing is said in Act 48 of 1940 about the reorganization of the Executive Department. Thus it is clearly shown that each proposition was distinct from the other and either could have been submitted to the people and voted upon without affecting the other.
 

 Further examination of the provisions of Act 384 of 1940 shows, among other things, that the Act proposes to abolish the State Advisory Board and the State Board of Liquidation. The State Advisory Board was created by section 22 of Article VI of the Constitution. No attempt is made by Act 384 of 1940 to expressly repeal that article and section. The proposal provides merely that the State Advisory Board shall be abolished* The State Board of Liquidation was created by a legislative act and is abolished merely by name in the proposed amendment.
 

 In addition to abolishing the Legislative Bureau and making the Lieutenant Governor, except when acting as Governor, and the State Auditor members of the Legislative Department, the proposed amendment in effect nullifies the right given by the Constitution to the Legislature to control appropriations necessary for-carrying on the State government. The performance of this purely Legislative function is subordinated to the will of an agent of the Executive Department. As illustrative of this, we find from the testimony in the record that Mr. Jerome A. Hayes, while serving in the capacity of Acting Budget Officer under the authority
 
 *562
 
 of Act 48 of 1940, reduced certain appropriations which the Legislature had made directly to certain State agencies. Among the State agencies whose appropriations were reduced is the Charity Hospital at New Orleans. The Legislature, for the fiscal'year of 1940-41, appropriated for the hospital the sum of $4,233,000. Hayes ordered the appropriation reduced to $3,-715,915.90, or a total reduction of $517,-084.10. From this it appears that although the Legislature, a department of government, independent of the Executive Department, exercising its constitutional right, appropriated a certain amount for the purpose of operating the Charity Hospital for a certain fiscal year, the Acting Budget Officer, created by one of the Legislative Acts adopted under the authority of the proposed constitutional amendment, took from the legislative appropriation an amount exceeding a half million dollars.
 

 We might refer to other proposals contained in Act 384 of 1940 to show that they relate to more than one object, but, because' of lack of time and space, we shall refrain from doing this, and shall end our discussion on this phase of the case with only one more apt illustration which shows that the proposals embrace at' least two distinct and separate objects, not ' dependent upon nor connected with each •other.
 

 At the end of the proposed amendment immediately preceding the proposed section 8 relative to the official ballot to be used at the election for the approval or rejection of the amendment, appears the following: “Section 7. Article XVI-A, in its entirety, including the introductory clauses and Sections 1, 2, 3, 4, 5, 6, 7, 8, 9, and 10, thereof, is hereby repealed.”
 

 The proposal as written conveys no information whatever to the reader. A proper understanding of its meaning can be had by reference only to the Constitution itself. When the Constitution is referred to, it discloses that Article XVI-A appears under the caption “Caernarvon [Levee] Break — Reparation Claims.” This article became a part of the Constitution, by the adoption of amendments in 1927 and 1928 to meet the emergency with which the City of New Orleans was confronted by reason of the unusual height attained by the waters of the Mississippi River. A section of the levee below the City of New Orleans was blown up so as to provide an additional outlet for the waters of the river and to lower the threatening stage of the waters at the City and thus save it from a disastrous flood. The result of this action is what became known as the Caernarvon Crevasse. The crevasse caused considerable damage to property situated in the parishes below the City of New. Orleans and Article XVI-A was embodied in the Constitution for the purpose of setting up the machinery and method for compensating property owners for their losses. The constitutional amendment provided the conditions under which such payments should be made, established a reparations committee to consider and determine claims for reparations for damages arising from the creation of the Caernarvon artificial crevasse and authorized and directed the Orleans Levee Board to
 
 levy a special tax
 
 each year, beginning with the year 1928, in order to
 
 *564
 
 provide funds for the above purposes, to capitalize the tax, and to issue bonds,, and dedicating the proceeds of the tax to the payment of the principal and interest of the bonds until all the bonds shall have been paid in full.
 

 Under the authority and as directed by the constitutional article, the Orleans Levee Board issued bonds of the value of several millions of dollars and annually levied a tax on the property owners of the City of New Orleans for the purpose of paying the principal and interest due on the bonds. Apparently, due to the low-interest market, the Legislature, at the Third Extra Session of 1934, adopted Act 28, authorizing the Levee Board to refinance the bond issue in question. In December 1936, acting under the authority of this legislative act, the Orleans Levee Board refunded outstanding bonds to the amount of $3,387,000. The refunding operation resulted in a litigation that finally reached this Court. See Tonry v. Board of Levee Commissioners, 186 La. 159, 171 So. 836, 838.
 

 The effect of the decree of this Court, affirming the judgment of the district court in the Tonry case, was to assure the holders of the refunding bonds that these bonds were as fully protected as were the original bonds by the guarantees of Article XVI-A of the Constitution. This Court, in a unanimous decision, quoted with approval the following language appearing in the opinion of the trial judge: “It is a substitution of the new bonds for the old bonds with the same obligations and the same liabilities and the same source provided by law for liquidating the debt.”
 

 The Court, which, in the exercise of its. proper judicial function, assured the holders of the municipality’s obligations that those obligations were constitutionally secured and protected, is now asked to declare that by the adoption of an amendment illegally submitted the obligors can repudiate their obligations by destroying “the source provided by law for liquidating the debt.” This the Court must decline to do.
 

 Counsel for relators insist that the repeal of Article XVI-A was necessary, because it represented so much “dead wood” in the Executive Department, and it was “in complete accord with the unity of purpose of the Reorganization Amendment, and entirely fits into the scheme thereof.”
 

 It is difficult to understand counsel’s insistence on this point. They concede, as, they must concede, that Article XVI-A is. in full force and effect to the extent that it directs that taxes must be levied annually for the purpose of paying the principal and interest of the bonds issued by the Orleans Levee Board and that such levy and collection of taxes must continue until the final liquidation of all the bonds, which will be many years hence. This concession destroys the force of their argument. Apart from this, it is plain that the repeal of Article XVI-A ha-s no connection whatever with the establishment of an administrative code or a fiscal code, or with the abolishment of the Legislative Bureau, or the making of the Lieutenant Governor and the State Auditor members of the Legislative Department, or with any number of other provisions embraced in the proposed amendment.
 

 
 *566
 
 Counsel for relators argue that a new section, which the amendment proposes to add to Article VT-A as section 17, embraces a saving clause which is sufficient to maintain Article XVI-A in effect. The argument is not sound.
 

 Article VI-A, as it appears in the Constitution, refers to the general subject of •Gasoline Taxes for Ports and Schools. .'Section 17, which it is proposed to add to Article VI-A, reads as follows:
 

 “Section 17. Any law heretofore adopted, the purpose or effect of which is to prescribe uniform requirements or procedures with respect to any matter of financial administration as herein defined, and with respect to all agencies of the State without •distinction, except any distinction made necessary by provisions of this Constitution, shall be given full force and effect, without any such exception or other restriction, any provision of this Constitution to the contrary notwithstanding.”
 

 [28] A mere reading of the proposed new section 17 discloses that it refers exclusively to those laws which prescribe uniform requirements or procedures with respect to matters of financial administration. It has no bearing on the bonded indebtedness of the State or of any of its subdivisions. By no stretch of the imagination can it be construed to save Article XVI-A, the repeal of which was so carefully provided by the framers of the proposed amendment. The proposal not only calls for the repeal of Article XVI-A in Its entirety including its introductory clauses, but it meticulously provides for the repeal by number of each section of Article XVI-A, including section 9 which imposes the duty on the Orleans Levee Board to issue the Reparation Bonds and to levy annually a special tax for the payment of the principal and interest of the bonds, for which purpose the proceeds of the special tax are expressly dedicated.
 

 [29] Counsel for relators assume that respondents are questioning the validity of the bonds issued by the Orleans Levee Board, and they say this can not be done, since respondents’ suit was brought more than thirty days after the bonds were issued. The assumption is not warranted by the record. Respondents’ suit is calculated to preserve the integrity of the bonds and not to impair it, as is sought to be done by the proposed repeal of Article XVI-A. As we understand it, the purpose of respondents in directing attention to the proposed repeal of Article XVI-A is to demonstrate the merit of their contention that the proposed amendment violates the constitutional requirement for the separate submission of amendments to the electors. Article XVI-A constitutes independent •legislation which was approved by the people, acting to avert a calamity with which they were threatened. The question of its repeal, if it is desired, which is unthinkable, should be submitted to the people as a separate and distinct proposition. It should not be confused with nor merged in any dther proposition.
 

 [30] If this Court should hold that Act 384 of
 
 1940
 
 was constitutionally adopted, the serious result would be to revoke the authority of the Orleans Levee Board to annually levy a special tax and of the State
 
 *568
 
 Treasurer. to use the avails of the tax for the establishment of a sinking fund and for the payment of the principal and interest of- the obligations issued by the Levee Board under Article XVI-A. It is easy to visualize that such an undesirable result would seriously affect not only the credit' of the Orleans Levee Board but also the credit of the state itself. We are satisfied that the voters of this State, in approving Act 384 of 1940, did not contemplate or intend to repeal Article XVI-A of the Constitution, thereby, destroying, or attempting to destroy, the contract rights of numerous institutions and persons based thereon.
 

 The answer of relators contains a plea of estoppel made in the alternative. The plea is founded on relators’ contention that respondents should have urged their complaint to the validity of the proposed amendment prior to the time of its submission, and not having done so, it- is too late for them to complain after the amendment has become effective by the vote of the people. But respondents could not know in advance that the proposed amendment would be approved. If it had been rejected, the question of whether it was constitutional or not would have been unimportant. In submitting the amendment to the vote of the people,, the Legislature violated two mandatory provisions of the Constitution itself. Therefore, the amendment was submitted and adopted in contravention of express constitutional prohibitions. An estoppel may not be invoked to validate a proceeding which is invalid per se. By merely remaining passive for a few months after its adoption and promulgation, respondents did not es-top themselves from maintaining an action to contest the validity of the proposed amendment.
 

 A party is not estopped to insist upon his constitutional rights by waiting until a law is passed or a regulation is-made. San Joaquin & K. R. C. & I. Co. v. Stanislaus County, 233 U.S. 454, 34 S.Ct. 652, 58 L.Ed. 1041. There are cases where a party may be estopped by reason of his-failure to assert a right. Counsel for relators cite a number of these cases in which the courts have held that certain technical errors of procedure committed by the legislatures in presenting constitutional amendments were not sufficient to invalidate the amendments, if, unobjected to, they were approved by the electors. But this is not such a case. Among the cases cited by relators are the Louisiana cases of Board of Liquidation v. Whitney-Central Trust & Savings Bank, 168 La. 560, 122 So. 850, and Saunders v. Board of Liquidation of City Debt, 110 La. 313, 314, 34 So. 457, 458.
 

 In the Whitney Bank case, the sole question presented for decision, as shown by the opinion, was the complaint that the legislative proposal, as amended in the Senate, was not concurred in by two-thirds of the membership of the House. The Court found as a fact that there had been no true amendment of the proposal, since the so-called amendment related solely to diction, grammatical construction, and punctuation, which in no wise affected its substance.
 

 It is significant to note that in the Saunders case Act 4 of 1899, Ex.Sess., which was under construction there, em
 
 *570
 
 braced only a single object and the Legislature expressly designated the date of the election at which the proposal was to be submitted to the electors for their approval or rejection. The only objection urged to the proposed amendment in that case was that there was not a reading in full of the proposed amendment on three separate days in each House, but only one full reading and two readings by title. This Court found that the wording of the constitutional requirement was “have been read,” and not “have been read in full,” and that according to the legislative practice, the reading complained of was sufficient. In passing upon the question involved, the author of the opinion exptessed himself as follows: “The two important, vital elements in any constitutional amendment are the assent of two-thirds of the Legislature and a majority of the popular vote. Beyond these, other provisions are of mere machinery and forms. They may not be disregarded, because by them certainty as to essentials is secured. But they are not themselves essentials.” Using these words as a basis for the statement, counsel for relators say: “The very least that can be said for the Amendment in question is that the assent of two-thirds of the Legislature and a majority of the popular vote having been obtained, the Amendment is valid and subsisting.”
 

 As we have shown, the only question before the Court in the Saunders case was the construction to be given to the three words, “have been read,” in connection with the reading of the amendment in both houses. The Court did not have before it the question of the failure of the Legislature to obey the constitutional requirement that when more than one amendment is submitted at the same election, the amendment shall be submitted so as to enable the electors to vote on each amendment separately. Both requirements, the one providing for a two-thirds vote of the Legislature, and the other providing for the separate submission when more than one amendment is proposed, appear in section 1 of Article 21 of the Constitution. One is as essential as the other to the proper submission of the proposed amendment.
 

 The correct view concerning the constitutional requirement for the proposal and adoption of constitutional amendments was broadly expressed by this Court in State ex rel. Bahns v. City of New Orleans, 163 La. 777, 112 So. 718, 720: “The Constitution, by section 1, article 21, expressly points out when and how amendments to the Constitution may be proposed and considered by the Legislature, and adopted by a vote of the people, when so submitted. The manner of proposing and adopting amendments to the Constitution as thus provided is exclusive. The Constitution cannot be altered, changed, affected, or amended in any other manner, unless express and direct permission is given to the Legislature by the Constitution itself.”
 

 According to section 1 of article 21 of the Constitution, five elements are indispensable to give validity to a proposed constitutional amendment. They are: The assent of two-thirds of the Legislature, the submission of only one amendment in each proposal, the designation by the Legislature of the date of the election at which
 
 *572
 
 the submission shall take place, the publication of the proposed amendment, and a majority of the popular vote. Each of these essentials is as important as the other. In the absence of any one of them, the proposed amendment is without legal effect.
 

 The requirement, established in a number of states, that when more than one amendment is submitted to the electorate at the same election, such amendments must be so submitted as to enable the electors to vote on each separately, is one indication of a recognition of the seriousness of the matter of making changes in the fundamental law. The purpose of such a constitutional provision is to prevent voters from being required to vote for something which they disapprove in order to register approval of the other propositions tied up therewith. 11 American Jurisprudence, Constitutional Law, sec. 31, p. 635.
 

 This brings us to the consideration of the final, and apparently the most seriously relied on, argument made on behalf of the relators. The argument is, that the people themselves, by an overwhelming majority, have approved Act 384 of 1940, submitted to them as Amendment No. 3, and that if there are any defects in the submission and adoption of the amendment, those defects have been cured by such approval.
 

 At the outset of the discussion arising upon this argument, it may be remarked that the majority in favor of Amendment No. 3 was not so overwhelming as counsel for relators would have it appear. According to the returns of the election, as reported by the commissioners, the majority in favor of the amendment was only 6,667 votes in a total of 274,419 votes cast on the amendment.
 

 Mr. Cooley, the most eminent writer on Constitutions and the jurisprudence which makes them effective, has said:
 

 “The theory of our political system is that the ultimate sovereignty is in the people, from whom springs all legitimate authority. The people of the Union created a national constitution, and conferred upon it powers of sovereignty over certain subjects, and the people of each State created a State government, to exercise the remaining powers of sovereignty so far as they were disposed to allow them to be exercised at all. By the constitution which they establish, they not only
 
 tie up
 
 the hands of their official agencies,
 
 but their own hands as well;
 
 and neither the officers of the State,
 
 nor the whole people as an aggregate body, are at liberty to take action in opposition to this fundamental law."
 
 Cooley’s Constitutional Limitations, 8th Edition, Vol. I, p. 81. (Writer’s italics.)
 

 The general rule governing the restraints which the people have placed in their Constitution upon themselves, their officers, agents and representatives, is set forth in 16 C.J.S., Constitutional Law, § 7, in the following language :
 

 “Provisions of a constitution regulating its own amendment, * * * are not merely directory, but are mandatory; and a strict observance of every substantial requirement is essential to the validity of the proposed amendment.
 
 These provisions are as binding on the people as on the legislature, and the former are powerless by their vote of acceptance to give legal sane
 
 
 *574
 

 tion to an amendment the submission of which was made in disregard of the limitations contained in the constitution."
 
 (Writer’s italics.)
 

 The above rule has been announced and followed in a number of cases decided by both federal and state courts. Thus, in Duncan v. McCall, 139 U.S. 449, 11 S.Ct. 573, 576, 577, 35 L.Ed. 219, to which we have hereinabove referred, the Supreme Court of the United States, speaking through Chief Justice Fuller, declared that: “ * * * while the people are thus the source of political power, their governments, national and state, have been limited by written constitutions,
 
 and they have themselves thereby set the bounds to their own power, as against the sxidden impulses of mere majorities."
 
 (Writer’s italics.)
 

 In disposing of the argument that a favorable vote by the electorate on a proposal to amend the constitution cures antecedent failures to observe the commands of the constitution with respect to the formulation or submission of such proposals, the Supreme Court of Alabama, in the case of Johnson v. Craft, 205 Ala. 386, 87 So. 375, 387, to which we have hereinabove referred, on rehearing, declared: “The people themselves are bound by the Constitution ; and, being so bound, are powerless, whatever their numbers, to change or thwart its mandates, except through the peaceful means of a constitutional convention, or of amendment according to the mode therein prescribed, or through the exertion of the original right of revolution. ‘The Constitution may be set aside by revolution, but it can only be amended in the way it provides,’ said Hobson, C. J., in McCreary v. Speer, 156 Ky. 783, 791, 162 S.W. 99, 103.”
 

 The question under discussion was also considered by the Supreme Court of Iowa in Koehler v. Hill, 60 Iowa 543, 14 N.W. 738, 741, 15 N.W. 609. The court,'in holding that a proposed constitutional amendment improperly submitted was not validated by the favorable vote of the electors, expressed itself in these words: “It matters not if not only every elector, but every adult person in the state, should desire and vote for an amendment to the constitution, it cannot be recognized as valid unless such vote was had in pursuance of, and in substantial accord with, the requirements of the constitution.” To the same effect, see Oakland Paving Co. v. Hilton, 69 Cal. 479, 11 P. 3, where the rule announced in the Koehler case was thoroughly discussed and approved by the Supreme Court of California.
 

 We know of no textwriter on Constitutional Law, nor of any decision by the highest court of any of the states that questions the soundness of the above mentioned rule. On the contrary, every well-recognized authority and every decision on the subject concede, not only the soundness of, but the absolute necessity for, the rule that once the people have agreed on the method .to be followed in effecting changes in their fundamental law, they are powerless to alter the terms of their agreement except in the manner provided in the agreement itself.
 

 Jameson, in his work on Constitutional Conventions, which was approved by
 
 *576
 
 Cooley in his work on Constitutional Limitations, in discussing those clauses of the constitution which prohibit their amendment except in the ways and modes prescribed, after stating that, “restriction is really the policy and the law of the. country,” also states: “The idea of the people thus restricting themselves in making, changes in their Constitutions is original, and is one of the most signal evidences that amongst us liberty means, not the giving of rein to passion or to thoughtless impulse, but the exercise of power by the people for the general good, and, therefore, always under the restraints of law.”
 

 It is' asserted on behalf of relators that if this Court maintains respondents’ contentions, it will be the first time in its history the Court has held that a constitutional amendment, approved by the vote of the people, is unconstitutional. But everything must have a first time, as is forcibly illustrated by the fact that it is the first time a proposal, embracing such a drastic change in our fundamental law, as the one under review, has been submitted to the voters. It is also the first time that the Legislature, in submitting a proposed constitutional amendment, has failed to comply with two of the essential requirements of the Constitution itself.
 

 While this Court never has had occasion to declare a constitutional amendment unconstitutional, it has had occasion to declare unconstitutional a clause embraced in a Constitution regularly adopted by a Convention called by the Legislature for that purpose, subject to certain restrictions set forth in the legislative act. The Constitution in question was the Constitution of this State adopted in the year 1913. Article 190 of the Constitution of 1913 amended and re-enacted Article 190 of the preceding Constitution of 1898.
 

 Article 190 of the Constitution of 1913 was attacked as unconstitutional in the case of State v. American Sugar Refining Co., 137 La. 407, 68 So. 742. The suit was one instituted by the district attorney for the Parish of Orleans, acting under the instructions of the Governor of the. State of Louisiana, against the American Sugar Refining Company, because of its alleged long and persistent violation of the anti-trust and anti-monopoly laws of the State of Louisiana and particularly of its conspiring to force down the price of raw sugar, an important agricultural product of the State, and to enhance the price of refined sugar for purely speculative purposes.
 

 The ground of attack on the constitutional article was that it enlarged the duties of the district attorney in violation of the constitutional prohibition against changing the provisions of existing laws relating to or affecting the term of office, duties, or compensation of any existing officer. Notwithstanding it is a well settled rule of constitutional law that the authority of the constitutional convention is plenary, even though, as is held in many jurisdictions, the statute providing for it undertakes to limit its powers, this Court held that Article 190 of the Constitution of 1913 was invalid so far as it attempted to authorize the district attorney to institute the suit on the part of the state. The basis of the decision was that under the law as then existing, the
 
 *578
 
 district attorney had no authority to represent the State, except in criminal cases, and that neither the Governor nor the Attorney General, by directing him to institute the s.uit, could enlarge his powers.
 

 Hall v. Godchaux, 149 La. 733, 90 So. 145, 150, presents a case where this Court, disregarding the majority vote of1 the electorate, refused to uphold the nomination of' the democratic candidate to fill a vacancy on this Court. In that case, Judge Godchaux received a substantial majority of the votes cast, which, in the absence of a contest, would have made him the party nominee. However, his right to the nomination was challenged by one of his opponents, on the ground that he was not a qualified elector as required by the Constitution and laws of this State. Plaintiff alleged that Judge Godchaux was a resident of Pass Christian, Mississippi. Judge Godchaux, on the other hand, asserted that he only maintained a summer home at Pass Christian and that his legal domicile was in the City of New Orleans. While not holding that Judge Godchaux was a resident of Mississippi, this Court held that he was not a qualified elector of this State, and, therefore, he was “precluded from receiving the nomination for the place which he seeks.”
 

 The Court, in passing upon defendant’s contention that plaintiff was without right to contest the nomination, expressed itself as follows: “We think it could hardly be said that one who was in no wise eligible, either because of his residence or of having in no sense otherwise complied with the law by filing his declaration, etc., but had induced the Secretary of State to print his name on the ticket at the last moment, would be immune to a suit of this character,
 
 even though he received, a majority of the qualified votes.”
 
 (Writer’s italics.)
 

 If the vote of the people in that case was not sufficient to validate Judge Godchaux’s nomination, by the same token the vote of the people in this case was not sufficient to validate the proposed constitutional amendment.
 

 Our apology for this lengthy opinion is to be found in the importance of the questions presented — questions which so vitally affect the organic law of this State and the relationship that exists among all the departments of the state government. The reluctance of the Court to declare an ordinary enactment of the Legislature void, because it is in conflict with the Constitution, is intensified in a situation like this which requires the Court to declare an attempted constitutional amendment invalid, because it was not proposed in conformity to the fundamental law. In the determination of the difficult and delicate questions presented, this Court is animated solely by the desire to discharge its solemn duty to enforce the Constitution as the paramount law — a law which is as binding on the Court as it is oh the Executive Officers, the members of the Legislature, and the people themselves.
 

 Our conclusion is that Act 384 of 1940 is without effect, because it was not constitutionally adopted, and therefore the trial judge was warranted in issuing the preliminary injunction under review here.
 

 For the reasons assigned, the rule nisi issued herein is discharged, the stay order
 
 *580
 
 rendered in connection therewith is recalled, and relators’ application is dismissed.
 

 O’NIELL, C. J., and ODOM, J., dissenting.