893 So.2d 715 (2005)
FORUM FOR EQUALITY PAC, a Registered Louisiana Political Action Committee, Louisiana Log Cabin Republicans, an Unincorporated Louisiana Association, Laurence E. Best, Jeanne M. LeBlanc, Gerald W. Thibodeaux, William A. Schultz, and Julie A. Jacobs
v.
The Honorable W. Fox McKEITHEN, in his Official Capacity as Secretary of State of Louisiana only, and not Individually, and the City of New Orleans.
Nos. 2004-CA-2477, 2004-CA-2523.
Supreme Court of Louisiana.
January 19, 2005.
*716 Charles C. Fonti, Jr., Attorney General, Angie Rogers, LaPlace, Thomas S. Halligan, Merietta Spencer Norton, Assistant Attorneys General,; J. Michael Johnson, Patrick A. Trueman, for applicants.
Evans & Clesi, Kenneth Randall Evans, New Orleans; John Dowling Rawls, New Orleans; Martzell & Bickford, Regina O. Matthews, New Orleans; Sherry Sabolyk Landry, Deborah Margaret Henson, Evelyn Foley Pugh, Thomas Ainsworth Robichaux, Assistant City Attorneys, for respondents.
Richard Dale Moreno, lake Charles, for amicus curiae Richard D. Moreno.
Katherine Shaw Spaht, for amicus curiae, Katherine Shaw Spaht, Professor of Law.
John Randall Trahan, for amicus curiae, Randall J. Trahan, Associate Professor of Law.
KNOLL, Justice.
This case concerns a judgment of the district court declaring the constitutional amendment titled "Defense of Marriage," unconstitutional in violation of Article XIII, § 1(B) of the 1974 Constitution of Louisiana. For the following reasons we reverse, finding the district court erred by interpreting the single object requirement narrowly rather than employing a germane approach for a single object with multiple parts. We find each provision of the amendment is germane to the single object of defense of marriage and constitutes an element of the plan advanced to achieve this object.[1]Forum for Equality PAC v. Honorable W. Fox McKeithen, 04-2477(La.), 893 So.2d 715.[2]

FACTS AND PROCEDURAL HISTORY[3]
During the 2004 Regular Session, the Louisiana Legislature, by joint resolution *717 with a two-thirds majority of both houses, passed 2004 La. Acts 926. Through the passage of Act 926, the Legislature resolved "that there shall be submitted to the electors of the state of Louisiana, for their approval or rejection in the manner provided by law, a proposal to add Article XII, Section 15 of the Constitution of Louisiana." The amendment was to read as follows:
§ 15. Defense of Marriage
Section 15. Marriage in the state of Louisiana shall consist only of the union of one man and one woman. No official or court of the state of Louisiana shall construe this constitution or any state law to require that marriage or the legal incidents thereof be conferred upon any member of a union other than the union of one man and one woman. A legal status identical or substantially similar to that of marriage for unmarried individuals shall not be valid or recognized. No official or court of the state of Louisiana shall recognize any marriage contracted in any other jurisdiction which is not the union of one man and one woman.
The Legislature "further resolved that this proposed amendment shall be submitted to the electors of the state of Louisiana at the statewide election to be held on September 18, 2004."[4]
*718 Accordingly, the amendment was considered by the voters at the September 18, 2004 election, and the measure was approved by 77.78% of the electorate: 619,908 votes for and 177,067 votes against the amendment. See Official Promulgation of Election, as certified by Honorable W. Fox McKeithen on October 4, 2004 [04-CA-2477, Record, Defendant's Exhibit 4].
Following the election, the plaintiffs, Forum for Equality PAC, a registered Louisiana political action committee ("Forum"), Louisiana Log Cabin Republicans, an unincorporated Louisiana association, Laurence E. Best, Jeanne M. LeBlanc, Gerald W. Thibodeaux, William A. Schultz, and Julie A. Jacobs ("plaintiffs"), filed suit in the Nineteenth Judicial District Court, Parish of East Baton Rouge, against defendants, W. Fox McKeithen, in his official capacity as Secretary of State of Louisiana ("the State"), and the City of New Orleans ("the City").[5] Plaintiffs' suit, identified as brought pursuant to the Louisiana Election Code,[6] raised six challenges to the September 18, 2004 election and to the amendment. Their challenges include the following allegations:
I. The election in Orleans Parish was replete with irregularities resulting in the disenfranchisement of approximately twenty percent (20%) of those voters who attempted to vote that day. ("Count I")
II. The said election was conducted under an Election Code that is unconstitutional and fatally defective under Article XI, Section 1, Constitution of Louisiana, and its requirement that the *719 Legislature enact a comprehensive Election Code. ("Count II")
III. The constitutional amendment violates the Louisiana Declaration of Rights, being Article I, Constitution of Louisiana, by alienating inalienable rights set forth therein. ("Count III")
IV. The constitutional amendment violates the requirement of Article XIII, Section 1, Constitution of Louisiana, that a constitutional amendment be confined to one object. ("Count IV")
V. The constitutional amendment violates the requirement of Article XIII, Section 1, Constitution of Louisiana, that any constitutional amendment placed upon a ballot must first be prefiled prior to the legislative session where it is approved. ("Count V")
VI. The constitutional amendment violates the requirement of Article XIII, Section 1, Constitution of Louisiana, that a constitutional amendment be submitted to the voters at a statewide election. ("Count VI")[7]
In response to Count VI, that the amendment was not submitted to the voters at a statewide election, the State filed exceptions of res judicata and no cause of action, arguing this claim was rejected in Forum for Equality PAC v. City of New Orleans, 04-1521 (La.App. 4 Cir. 8/30/04), 881 So.2d 777, writ denied, 04-2239 (La.9/2/04), 882 So.2d 587.[8]
Thereafter, State Senators Heulette "Clo" Fontenot, John J. Hainkel, Jr., and State Representatives A.G. Crowe and Steve J. Scalise,[9] along with Louisiana Family Forum, Louisiana Family Forum Action, and American Family Association of New Orleans filed a Petition of Intervention, which the district court granted.[10] Intervenors aligned and united with defendants, the State and City, in resisting plaintiffs' demands.
The suit proceeded to trial on October 5, 2004. After trial, the district court, Judge William A. Morvant presiding, entered judgment in favor of plaintiffs and declared the amendment unconstitutional in violation of La. Const. art. XIII, § 1(B) on the grounds that it contained more than one object, pretermitting plaintiffs' other constitutional arguments. The district court stated in its two-page written judgment:

*720 The Court having considered all evidence, including both live and written testimony, as well as all documents introduced into evidence or considered by judicial notice, and the Court having considered both written and oral argument from all parties, and the Court being fully informed in the premises, for the Reasons for Judgment stated from the Bench,
IT IS ORDERED, ADJUDGED AND DECREED that:
1. The Court grants the Petition of Intervention.
2. The Court grants the Exception of Res Judicata as to Count VI against all Plaintiffs.[11]
3. The Court declines as unnecessary to rule upon Counts I, II, III and V.
4. The Court grants Judgment in favor of all Plaintiffs and against all Defendants and Intervenors/Defendants on Count IV and invalidates the election held on September 18, 2004, upon House Bill 61, also known as Act No. 926, Acts of Louisiana, also known as Constitutional Amendment No. 1. In so ruling, the Court expressly declares the said proposed constitutional amendment to be unconstitutional and in violation of Article XIII, Section 1(B), 1974 Constitution of Louisiana.
5. The Court stays the effect of the said proposed constitutional amendment, including but not limited to staying the issuance of any proclamation pursuant to the first sentence of Article XIII, Section 1(C), 1974 Constitution of Louisiana, to permit higher Courts to review this Judgment as appropriate.
In reaching the conclusion the amendment contained multiple objects, the district court relied in part on the principles enunciated by this Court in Graham v. Jones, 198 La. 507, 3 So.2d 761 (1941), and Miller v. Greater Baton Rouge Port Com'n, 225 La. 1095, 74 So.2d 387 (1954). In oral reasons for judgment,[12] the *721 district court stated that while the first, second, and fourth sentences of the amendment can easily be construed as part of the object of the amendment dealing with the constitutional prohibition of same-sex marriage and are likewise consistent with existing law, see La. Civ.Code arts. 86, 89, 94, 96, and 3520(B),[13] the third *722 sentence clearly addresses civil unions or contracts between persons of the same sex that are otherwise not covered by the same-sex marriage ban and "appears to be a catchall provision applying to all other situations or contracts other than same-sex marriage." See 04-CA-2477, Record p. 225. As such, the court felt "it constitutes a separate and distinct object which, under the provisions of article XIII, section 1.(B), require a separate amendment or proposal to address that object."[14]See 04-CA-2477, Record p. 225.
From this ruling, the State and all intervenors sought a suspensive appeal, lodging the record both in this Court and the Court of Appeal, First Circuit. The Court of Appeal in a per curiam opinion concluded it lacked appellate jurisdiction over the case and, therefore, transferred the appeal to this Court.[15]Forum for Equality PAC v. Honorable W. Fox McKeithen, *723 04-2182 (La.App. 1 Cir. 10/13/04), 886 So.2d 1172. Consequently, the transferred case (04-CA-2523) has been consolidated with the State's direct appeal (04-CA-2477).

LAW AND ANALYSIS
Prefatorily we note the issues presented concern strictly a matter of law. As the district court correctly noted in its reasons for judgment, emotions do not govern our resolution of this case. Rather, our role in this state's constitutional scheme as the final judicial authority is to review the district court's legal conclusions. We are called upon to decide whether this amendment to the Constitution of Louisiana conforms to constitutionally established requirements.

Standard of review
Whether a constitutional amendment confines itself to a single object is a question of law. Forum for Equality PAC v. City of New Orleans, 04-1521, p. 7 (La.App. 4 Cir. 8/30/04), 881 So.2d 777, writ not considered, 04-2239 (La.9/2/04), 882 So.2d 587. Appellate review of questions of law is to discern whether the district court's interpretative decision is legally correct. See Gonzales v. Xerox Corp., 320 So.2d 163, 165-66 (La.1975). If legal error is found, the legal conclusions of the district court are thus subject to de novo review by this Court. Id. Accordingly, under a de novo standard, we must examine the actions of the Legislature in submitting the constitutional amendment to the people in light of constitutional restraints.

Amending the Constitution of Louisiana
"Provisions of a constitution regulating its own amendment, * * * are not merely directory but are mandatory; and a strict observance of every substantial requirement is essential to the validity of the proposed amendment." Graham, 3 So.2d at 782, quoting 16 C.J.S., CONSTITUTIONAL LAW § 7. This general rule governs the restraints which the people have placed in their Constitution upon themselves, their officers, and agents and representatives. Id. Thus, in submitting an amendment to the people, the Legislature is bound by the provisions of our constitution mandating the procedural process for amending the constitution.
Article XIII of the 1974 Constitution of Louisiana sets forth the procedure for proposing and adopting constitutional amendments. Article XIII, § 1 of the Louisiana Constitution provides, in full:
Section 1. (A) Procedure. An amendment to this constitution may be proposed by joint resolution at any regular session of the legislature, but the resolution shall be prefiled, at least ten days before the beginning of the session, in accordance with the rules of the house in which introduced. An amendment to this constitution may be proposed at any extraordinary session of the legislature if it is within the objects of the call of the session and is introduced in the first five calendar days thereof. If two-thirds of the elected members of each house concur in the resolution, pursuant to all of the procedures and formalities required for passage of a bill except submission to the governor, the secretary of state shall have the proposed amendment published once in the official journal of each parish within not less than thirty nor more than sixty days preceding the election at which the proposed amendment is to be submitted to the electors. Each joint resolution shall specify the statewide election at which the proposed amendment shall be submitted. Special elections for submitting proposed amendments may be authorized by law.

*724 (B) Form of Proposal. A proposed amendment shall have a title containing a brief summary of the changes proposed; shall be confined to one object; and shall set forth the entire article, or the sections or other subdivisions thereof, as proposed to be revised or only the article, sections, or other subdivisions proposed to be added. However, the legislature may propose, as one amendment, a revision of an entire article of this constitution which may contain multiple objects or changes. A section or other subdivision may be repealed by reference. When more than one amendment is submitted at the same election, each shall be submitted so as to enable the electors to vote on them separately.
(C) Ratification. If a majority of the electors voting on the proposed amendment approve it, the governor shall proclaim its adoption, and it shall become part of this constitution, effective twenty days after the proclamation, unless the amendment provides otherwise. A proposed amendment directly affecting not more than five parishes or areas within not more than five parishes shall become part of this constitution only when approved by a majority of the electors voting thereon in the state and also a majority of the electors voting thereon in each affected parish. However, a proposed amendment directly affecting not more than five municipalities, and only such municipalities, shall become part of this constitution only when approved by a majority of the electors voting thereon in the state and also a majority of the electors voting thereon in each such municipality.
La. Const. art. XIII, § 1(A) thus provides that an amendment to this state's constitution may be proposed by a joint resolution at any regular session of the Legislature.
Joint resolutions propose amendments to the constitution and must "be prefiled, at least ten days before the beginning of the session, in accordance with the rules of the house in which introduced." La. Const. art. XIII, § 1(A); LAMONICA & JONES, supra at § 2.2, p. 13. Joint resolutions are then given bill numbers and are processed as bills, including the designation of an act number by the secretary of state after passage by both houses of the Legislature. See La. Const. arts. III, § 15(A) and XIII, § 1(A) (requiring in addition to the two-thirds vote requirement, that concurrence in the joint resolution must be "pursuant to all the procedures and formalities required for passage of a bill except submission to the governor"); LAMONICA & JONES, supra. However, joint resolutions are not "bills" in the technical sense, because joint resolutions are not presented to the governor for executive action. See La. Const. art. III, § 17(B) ("No joint, concurrent, or other resolution shall require the signature or other action of the governor to become effective."); LAMONICA & JONES, supra.
A joint resolution must pass both houses of the Legislature by a two-thirds vote of the elected members of each house, and then must be ratified by at least a majority of voters to amend the constitution. LAMONICA & JONES, supra. Importantly, joint resolutions must contain a title and are generally confined to one object. Id.; see also, La. Const. art. XIII, § 1(B). The joint resolution must also specify the statewide election at which the proposed amendment will be submitted to the voters, and the secretary of state is mandated to timely publish the language of the proposed amendment in the official journal of each parish. La. Const. art. XIII, § 1(A); LAMONICA & JONES, supra.
Moreover, joint resolutions routinely include ballot language summarizing the *725 proposed change, despite the language of the constitution requiring the secretary of state to prepare the ballots for all elections. LAMONICA & JONES, supra, p. 14; see also, La. Const. art. IV, § 7 (including as a duty of the secretary of state to "prepare and certify the ballots for all elections"). Note, the ballot language need only constitute "sufficient information to identify the proposed amendment which the voter is voting for or against." LAMONICA & JONES, supra, p. 14. Further, the publication of the proposed amendment has been deemed as satisfying the due process requirements of notice to voters of its contents. LAMONICA & JONES, supra, p. 14, citing Hotard v. City of New Orleans, 213 La. 843, 35 So.2d 752, 756 (1948), appeal dismissed, 335 U.S. 803, 69 S.Ct. 57, 93 L.Ed. 360 (1948). Finally, when the Legislature submits more than one amendment at the same election, each amendment must be submitted so as to enable the voters to vote on them separately. La. Const. art. III, § 1(B); LAMONICA & JONES, supra, p. 14.

Legislative History of Act 926[16]
In compliance with constitutional requirements, Act 926 was prefiled in the House of Representatives on March 1, 2004, and introduced as House Bill 61, providing in its original form:
A JOINT RESOLUTION
Proposing an amendment to the Constitution of Louisiana, to enact
Article I, Section 27, relative to marriage; to define marriage; to prohibit the conference of marital rights; to provide for submission of the proposed amendment to the electors; and to provide for related matters.
Section 1. Be it resolved by the Legislature of Louisiana, two-thirds of the members elected to each house concurring, that there shall be submitted to the electors of the state of Louisiana, for their approval or rejection in the manner provided by law, a proposal to add Article I, Section 27 of the Constitution of Louisiana, to read as follows:
§ 27. Definition of Marriage
Section 27. Marriage in the state of Louisiana shall consist only of the union of one man and one woman. Neither this constitution nor state law shall be construed to require that marital status or the legal incidents thereof be conferred upon unmarried couples or groups. No official or court of the state of Louisiana shall recognize any marriage contracted in any other jurisdiction which is not the union of one man and one woman.
Section 2. Be it further resolved that this proposed amendment shall be submitted to the electors of the state of Louisiana at the statewide election to be held on November 2, 2004.
Section 3. Be it further resolved that on the official ballot to be used at said election there shall be printed a proposition, upon which the electors of the state shall be permitted to vote FOR or AGAINST, to amend the Constitution of Louisiana, which proposition shall read as follows:
To define marriage as the union of one man and one woman and to provide that neither the constitution nor laws of this state shall be construed to confer marital status or any legal incidents thereof upon unmarried couples or groups; to provide that no official *726 or court may recognize any marriage contracted in another jurisdiction unless it is a union between one man and one woman. (Adds Article I, Section 27).[17]
Subsequently, House Bill 61 was provisionally referred to the House Committee on Civil Law and Procedure.
The House Committee on Civil Law and Procedure proposed three amendments to House Bill 61. Amendment No. 1 proposed the substitution of the text  "to provide for valid and recognized marriages; to provide for the legal incidents of marriage;" for the text  "to prohibit the conference of marital rights;"in line three of the original bill. Amendment No. 2 proposed a complete revision to the proposed constitutional text:
§ 27. Defense of Marriage
Section 27. Marriage in the state of Louisiana shall consist only of the union of one man and one woman. No official or court of the state of Louisiana shall construe this constitution or any state law to require that marriage or the legal incidents thereof be conferred upon any member of a union other than the union of one man and one woman. A legal status identical or substantially similar to that of marriage for unmarried individuals shall not be valid or recognized. No official or court of the state of Louisiana shall recognize any marriage contracted in any other jurisdiction which is not the union of the one man and one woman.
Amendment No. 3 proposed a complete revision to the proposed proposition:
"To provide that marriage in this state shall consist of the union of one man and one woman; to provide that legal incidents of marriage shall not be conferred upon a union other than the union of one man and one woman; to provide that a legal status similar to marriage shall not be valid or recognized for unmarried individuals; to prohibit the recognition of any marriage contracted in another state which is not the union of one man and one woman. (Adds Article I, Section 27)".
Original House Bill 61 was so amended and order engrossed on May 12, 2004. On May 18, 2004, Engrossed House Bill 61[18] *727 was finally passed, having received two-thirds vote of the members elect (87 yeas, 11 nays), its title was adopted, and the bill was ordered to the Senate.
In the Senate, the Engrossed House Bill underwent additional amendments. Though most of the amendments were technical in nature, three proposed substantial changes to the text of the bill. Amendment No. 2 proposed that the text "to provide for valid and recognized marriage; to provide for the legal incidents of marriage;"  be deleted from the first paragraph of the resolution and replaced with the following text:
"to require that marriage in the state shall consist only of the union of one man and one woman; to provide that the legal incidents of marriage shall be conferred only upon such union; to prohibit the validation or recognition of the legal status of any union of unmarried individuals; to prohibit the recognition of a marriage contracted in another jurisdiction which is not the union of one man and one woman;".
Amendment No. 9 proposed to substitute the language"  on a member of any union other than such union; and that the state shall not validate or recognize a legal status identical or substantially similar to that of marriage for unmarried individuals or any marriage contracted in any other jurisdiction which is not the union of one man and one woman. (Adds Article XII, Section 15) "for the text"upon a union other than the union of one man and one woman; to provide that a legal status similar to marriage shall not be valid or recognized for unmarried individuals; to prohibit the recognition of any marriage contracted in another state which is not the union of one man and one woman. (Adds Article I, Section 27)"  contained in the proposition.
Amendment No. 7 proposed a change to the date of the statewide election where the proposed amendment would be submitted to the public from November 2, 2004 to September 18, 2004. Finally, the Senate amendments also recommended the redesignation of the proposed constitutional amendment as Article XII, § 15, rather than Article I, § 27.
On June 9, 2004, the Engrossed House Bill was finally passed as amended (31 yeas, 6 nays), its title was read and adopted, and the bill was ordered to the House.[19]
On June 15, 2004, the Senate amendments, having received two-thirds vote of the members elect (88 yeas, 13 nays), were concurred in by the members of the House, and the bill was enrolled and signed by the Speaker of the House and the President of the Senate on June 16, 2004. On June 18, 2004, Enrolled House Bill 61 was presented to the Secretary of State by the Clerk of the House, and on July 12, 2004, the Enrolled House Bill became Act No. 926.
Act No. 926 provides, in its entirety:
A JOINT RESOLUTION
Proposing an amendment to the Constitution of Louisiana, to enact

*728 Article XII, Section 15, relative to marriage; to require that marriage in the state shall consist only of the union of one man and one woman; to provide that the legal incidents of marriage shall be conferred only upon such union; to prohibit the validation or recognition of the legal status of any union of unmarried individuals; to prohibit the recognition of a marriage contracted in another jurisdiction which is not the union of one man and one woman; to provide for submission of the proposed amendment to the electors and provide a ballot proposition; and to provide for related matters.
Section 1: Be it resolved by the Legislature of Louisiana, two-thirds of the members elected to each house concurring, that there shall be submitted to the electors of the state of Louisiana, for their approval or rejection in the manner provided by law, a proposal to add Article XII, Section 15 of the Constitution of Louisiana, to read as follows:
§ 15. Defense of Marriage
Section 15. Marriage in the state of Louisiana shall consist only of the union of one man and one woman. No official or court of the state of Louisiana shall construe this constitution or any state law to require that marriage or the legal incidents thereof be conferred upon any member of a union other than the union of one man and one woman. A legal status identical or substantially similar to that of marriage for unmarried individuals shall not be valid or recognized. No official or court of the state of Louisiana shall recognize any marriage contracted in any other jurisdiction which is not the union of one man and one woman.
Section 2. Be it resolved that this proposed amendment shall be submitted to the electors of the state of Louisiana at the statewide election to be held on September 18, 2004.
Section 3. Be it further resolved that on the official ballot to be used at said election there shall be printed a proposition, upon which the electors of the state shall be permitted to vote FOR or AGAINST, to amend the Constitution of Louisiana, which proposition shall read as follows:
To provide that marriage in this state shall consist of the union of one man and one woman, that legal incidents of marriage shall not be conferred on a member of any union other than such union, and that the state shall not validate or recognize a legal status identical or substantially similar to that of marriage for unmarried individuals or any marriage contracted in any other jurisdiction which is not the union of one man and one woman. (Adds Article XII, Section 15).[20]
*729 Finding that the third sentence of the constitutional amendment contained within this joint resolution, designated as Act 926, constituted a separate and distinct object from that contained within the first, second, and fourth sentences of the amendment, the district court declared the constitutional amendment unconstitutional in violation of La. Const. art. XIII, § 1(B)'s "single object" requirement. We will now address whether the district court erred in declaring the constitutional amendment unconstitutional.

"Single Object" Requirement
As cited above, La. Const. art. XIII, § 1(B) provides "a proposed amendment shall ... be confined to one object." This provision was adopted in the 1974 Constitution of Louisiana as a restatement of the theretofore existing "single object" rule, which was partially a creature of the jurisprudence arising from the interpretation of various provisions of earlier state constitutions. These earlier provisions provided: "When more than one amendment shall be submitted at the same election, they shall be so submitted as to enable the electors to vote on each amendment separately." See, La. Const. art. 21, § 1(1921); La. Const. art. 325 (1913); La. Const. art. 321 (1898); La. Const. art. 256 (1879);[21]see also, LEE HARGRAVE, THE LOUISIANA STATE CONSTITUTION: A REFERENCE GUIDE, 196 (1991); Graham, 3 So.2d at 782-83; Hotard, 35 So.2d at 755; Miller, 74 So.2d at 389-90. Although none of the various Louisiana state constitutions prior to the 1974 Constitution expressly required that every constitutional amendment be confined to one object, Louisiana courts had consistently ruled that constitutional amendments could not pertain to more than one object in their interpretation of the "separate votes" for "separate amendments" provisions noted above. See Graham, 3 So.2d at 782-84, 786-87 (O'Niell, C.J. dissenting); Hotard, 35 So.2d at 755; Miller, 74 So.2d at 390.
It was this jurisprudential interpretation that the people sought to continue in their adoption of the first sentence of La. Const. art. XIII, § 1(B). See 9 Records of the Louisiana Constitutional Convention of 1973: Convention Transcripts 3155 (1977) ("The basic requirement that a bill should be confined to one object includes that acts and joint resolutions should be confined to one object. That is traditional; it is sensible; it has been interpreted by the courts, and we ought to continue that same philosophy.") (Mr. Jenkins speaking). The two leading cases from this Court addressing this rule are Graham v. Jones, 198 La. 507, 3 So.2d 761 (1941),[22] and Miller v. Greater Baton Rouge Port Com'n, 225 La. 1095, 74 So.2d 387 (1954), which we will discuss in turn.
In Graham v. Jones, this Court addressed the validity of 1940 La. Acts 384, a joint resolution of the Legislature proposing a constitutional amendment, which made various changes to state government, including abolishing the Legislative Bureau and reorganizing the executive department. Graham, 3 So.2d at 766; see also HARGRAVE, supra. Moreover, as in the instant case, the amendment at issue in Graham was approved by the electorate. In its holding, this Court found the Act was without effect because it was not constitutionally adopted, applying a rather narrow construction of the "single object" rule.
*730 In its discussion, the Graham court explained the "single object" rule in light of the determination of whether one or more constitutional amendments were contained in a single proposition:
"If the different changes contained in the proposed amendment all cover matters necessary to be dealt with in some manner, in order that the Constitution, as amended, shall constitute a consistent and workable whole on the general topic embraced in that part which is amended, and if, logically speaking, they should stand or fall as a whole, then there is but one amendment submitted. But, if any one of the propositions, although not directly contradicting the others, does not refer to such matters, or if it is not such that the voter supporting it would reasonably be expected to support the principle of the others, then there are in reality two or more amendments to be submitted, and the proposed amendment falls within the constitutional prohibition. Nor does the rule as stated unduly hamper the adoption of legitimate amendments to the Constitution. Such a document was presumably adopted deliberately, after careful preparation, as a harmonious and complete system of government. Changes suggested thereto should represent the free and mature judgment of the electors, so submitted that they cannot be constrained to adopt measures of which in reality they disapprove, in order to secure the enactment of others they earnestly desire." [quoting Kerby v. Luhrs, 44 Ariz. 208, 36 P.2d 549, 554 (1934)]
* * *
"This provision of the Constitution is a wise one, and is intended to prevent several inconsistent and conflicting propositions from being submitted to the voters in the same amendment, and forcing the voter to approve or reject such amendment as a whole. In other words, it prevents burdening a meritorious proposition with a vicious one, and alike prevents a vicious proposition from having the support of a meritorious one, and gives to the voter the right to have each separate proposition submitted to him in order that he may express his will for or against each separately without being compelled to accept a provision to which he is opposed in order to have adopted a provision which meets his favor." [quoting McBee v. Brady, 15 Idaho 761, 100 P. 97, 101 (1909)]
* * *
Numerous cases from other jurisdictions are cited on behalf of relators in which the general rule has been laid down that a constitutional amendment embracing several subjects all of which are germane to the general subject of the amendment, under the requirement for separate submission where more than one amendment is proposed, may be submitted to people as a general proposition.
The question in this case is not whether the rule is sound, but whether it is applicable to the proposed amendment under review by the Court.
Graham, 3 So.2d at 776-77.[23]
Chief Justice O'Niell dissented, explaining the limitations of the "single object" *731 rule and advocating a broad construction of the rule:
That does not mean that each and every change that may be made in an amendment of the Constitution shall be the subject of a separate and distinct proposal, or separate joint resolution of the two Houses of the Legislature. It means, primarily, that, when two or more proposed amendments, or joint resolutions, appear on the same ballot, they must be arranged so that a voter can vote for or against any one of them separately. It is generally conceded by the courts that the spirit of this provision in the Constitution may be violated if two or more separate and independent changes are submitted in one proposal, or one joint resolution.
* * *
But the members of the Legislature, first of all, and necessarily, must exercise their judgment, when several changes in the provisions of the Constitution are proposed to be made at one time, and must decide whether the several proposed changes in the Constitution are so dependent upon each other that they ought to be submitted as one amendment, or are so independent and disconnected that they ought to be submitted as separate amendments. And when the Legislature has decided, in any given case, by the vote of two-thirds or more of the members of each House of the Legislature, that it is better that a proposed amendment should be submitted as only one amendment, and not as two or more separate amendments  and when a majority of the people by their votes have ratified and affirmed that decision  no court of justice should have the right to question the wisdom of it.
Graham, 3 So.2d at 786-87 (O'Niell, C.J., dissenting).[24]
*732 Expounding upon the discussion in Graham, this Court in Miller v. Greater Baton Rouge Port Com'n clearly expressed the "single object" rule as a germaneness test. In Miller, this Court addressed the issue as to whether an amendment to the constitution permitting the West Baton Rouge Port Commission to sell bonds had more than one object. The Court rejected the argument, finding "[t]he establishment of the Port and its administration is a single plan and only one object has been dealt with." Miller, 74 So.2d at 390. Most importantly, the Court clarified and expanded the reasoning in Graham and adopted a broad construction of the "single-object" rule through its germaneness test:
As pointed out in Graham v. Jones, 198 La. 507, 3 So.2d 761, where an amendment may be logically viewed as parts of a single plan, it may be submitted as one amendment. Where an act of the Legislature or an amendment to the Constitution embodies a single plan and every provision therein is germane to that plan, it is not violative of the Constitution.
Miller, 74 So.2d at 390.[25]
Thus, the "single object" rule as restated in La. Const. art. XIII, § 1(B) requires that an amendment to the Constitution embodies a single plan and that every provision therein is germane to that plan. In other words, the judiciary in determining whether the legislative action in submitting a constitutional amendment to the people is constitutional under the "single object" requirement must examine all the provisions of an amendment to ascertain whether every provision relates or is germane to the main purpose or object of the amendment. See, Hotard, 35 So.2d at 755.
The task of this Court is to identify the main purpose or object of the constitutional amendment and then to examine each provision to determine whether the amendment embodies a single plan to accomplish the object and whether every provision is germane to that plan, i.e., to determine "[i]f the different changes contained in the proposed amendment all cover matters necessary to be dealt with in some manner, in order that the Constitution, as amended, shall constitute a consistent and workable whole on the general topic embraced in that part which is amended." See Graham, 3 So.2d at 776. We note that "what is `germane' is that which is in close relationship, appropriate, relevant, or pertinent to the general subject." Louisiana Public Facilities Authority v. Foster, 01-0009, p. 16 (La.9/18/01), 795 So.2d 288, 299.
"[A]s the branch of government empowered to initiate constitutional amendments, the legislature should be afforded substantial deference to determine both the overall object of a proposed amendment and the changes incidental to and necessarily connected with the object intended." State ex rel. Chavez v. Vigil-Giron, 108 N.M. 45, 766 P.2d 305, 307 (1988), citing Barnhart v. Herseth, 88 S.D. *733 503, 222 N.W.2d 131, 135 (1974), Keenan v. Price, 68 Idaho 423, 195 P.2d 662, 676 (1948), State ex rel. Hudd v. Timme, 54 Wis. 318, 11 N.W. 785, 790 (1882), Hillman v. Stockett, 183 Md. 641, 39 A.2d 803, 808 (1944); see also, Graham, 3 So.2d at 786-87 (O'Niell, C.J., dissenting). We will afford substantial deference to the Legislature in determining the object of the constitutional amendment, and thus, we will examine the actions of the Legislature in drafting and proposing this amendment in order to ascertain its intended object.
As constitutionally required, "[a] proposed amendment shall have a title containing a brief summary of the changes proposed," La. Const. art. XIII, § 1(B), and the title may be referred to "in order to ascertain generally the scope and object of the proposed changes in the Constitution." Graham, 3 So.2d at 775; see also, Cobb v. Louisiana Bd. of Institutions, 111 So.2d at 131 ("The title of an act of the Legislature is of the nature of a label, the purpose of which is to give notice of the legislative intent and purpose to those interested in, or who may be affected by, the terms of the act, and to prevent surprise and fraud upon members of the Legislature."). Therefore, in our search for the amendment's intended object, we begin with the title the Legislature adopted for this amendment.
Act 926 titles the constitutional amendment, "Defense of Marriage"[26] and sets forth its purpose as "to enact Article XII, Section 15, relative to marriage; to require that marriage in the state shall consist only of the union of one man and one woman; to provide that the legal incidents of marriage shall be conferred only upon such union; to prohibit the validation or recognition of the legal status of any union of unmarried individuals; to prohibit the recognition of a marriage contracted in another jurisdiction which is not the union of one man and one woman." Given the clear and unambiguous language of the title adopted by the Legislature,[27] one could logically conclude the object of the amendment is "defense of marriage."
However, in further search of the intended object of this amendment and in an abundance of caution, we also look to the committee meeting discussions held by each house of the Legislature. The minutes of the House Civil Law and Procedure Committee indicated a concern that "the Civil Code of law followed in Louisiana" would not be adequate protection for marriage in this state without a constitutional amendment because "Louisiana's Civil Code would yield to provisions of the state constitution that might be found in conflict with it." See 2004 Regular Session, Minutes of Meeting of House Civil Law and Procedure Committee, May 11, 2004, p. 8 (Representative Gallot and Professor Trahan speaking).
Moreover, the minutes of the Senate Committee on Judiciary, Section A[28] also reflect this need for additional protection of our civil law tradition of marriage, noting that the "intent was to put this in the Louisiana Constitution so that the legal *734 issues of law cannot be challenged" because, although the protection of marriage is arguably provided for in our Civil Code, "[t]he constitution has a far greater protection ... than that of a statute." See Senate Committee on Judiciary, Section A, Minutes of Meeting, May 4, 2004, p. 6 (Senators Lentini and Hainkel speaking). Further, testimony was received that noted a potential "threat under Louisiana Constitution Article 1, sec 2, our due process clause," exists, which "place[s] our traditional marriage statutes at risk." Id. (Professor Katherine Spaht speaking). Although the amendment could not protect Louisiana's civil tradition of marriage from all attacks, specifically the United States Supreme Court's declaration of unconstitutionality, the testimony did note the amendment would provide additional protection to marriage. Id. at p. 11 (Senators Holden and Hainkel speaking).
The central theme running throughout these committee meetings is the need to protect or defend our civil tradition of marriage through the adoption of a constitutional amendment, which has as its sole object the defense and protection of our civil tradition of marriage.[29]
Thus, as evident from its title as proposed by the Legislature and the discussions in committee meetings, the object of this constitutional amendment is "defense of marriage," i.e., to defend this state's civil tradition of marriage. Notably, this is where the district court erred in that it is apparent from the court's reasoning that the district court, relying on Graham's narrow construction rather than Hotard's and Miller's broad construction, narrowly identified the object of the amendment as a "same-sex marriage ban." Although such a ban is effected by the provisions of the constitutional amendment, the ban itself is not the main purpose or object of the amendment.
Having ascertained the main object of the amendment, we must now determine whether each provision of the constitutional amendment relates to or is germane to this object of "defense of marriage," or rather, constitutes a single plan in "defense of marriage."
On the one hand, plaintiffs assert the amendment has three separate objects: (1) to reinforce the ban on same-sex marriage that already exists in Louisiana law; (2) to change the law by creating a ban on civil unions; and (3) to reverse existing law by destroying the right of unmarried couples to enter into contracts and other legal documents to protect themselves, their property, and their relationship. Plaintiffs essentially argue the amendment does not constitute a single plan and that its various provisions are not germane to one such plan. Plaintiffs reach this conclusion by dissecting the amendment sentence by sentence and interpreting every provision *735 as advancing a separate and distinct plan or object.[30]
The district court agreed in part with the plaintiffs in that the court found the amendment consisted of two objects and essentially two plans: (1) to constitutionally prohibit same-sex marriage as consistent with our present civil law; and (2) to *736 address civil unions or contracts between persons of the same sex. Thus, the district court found the provisions of the amendment were not germane to a single plan or object.
On the other hand, the State and the intervenors assert all the provisions of the amendment are essential to the main object of the amendment and set forth a single plan to adequately defend traditional marriage from all contemporary threats. According to the intervenors, the provisions of sentence one defend marriage against redefinition. The provisions of sentence two defend marriage against lawless acts by public officials and decisions by our courts interpreting our existing constitution. The provisions of sentence three defend against other alternative, legally recognized arrangements that would rival marriage, while sentence four defends against the recognition of unions in violation of the above from other states. Thus, the State and the intervenors conclude the Legislature's sole objective to defend marriage could not have been adequately accomplished without the inclusion of these provisions.
As discussed above, the object of this amendment is to defend marriage. Unquestionably, any adequate defense of marriage would have to be premised upon the understanding that our civil tradition of marriage necessarily entails both the concept of marriage and the civil effects and legal incidents flowing directly from marriage as provided by our civil law and our Civil Code. See, e.g., Civ.Code. arts. 86-159 (relative to marriage). With this understanding, we examine each provision of the amendment.
Sentence one obviously defines marriage: "Marriage in the state of Louisiana shall consist only of the union of one man and one woman." Sentence two refers to the effects and legal incidents of marriage: "No official or court of the state of Louisiana shall construe this constitution or any state law to require that marriage or the legal incidents thereof be conferred upon any member of a union other than the union of one man and one woman." Continuing the focus on the effects and incidents of marriage, sentence three refers to the legal status of marriage: "A legal status identical or substantially similar to that of marriage for unmarried individuals shall not be valid or recognized." Concluding, sentence four refers to recognition of out-of-state marriages: "No official or court of the state of Louisiana shall recognize any marriage contracted in any other jurisdiction which is not the union of one man and one woman."
Such an examination reveals the amendment contains a single plan to defend our civil tradition of marriage. In effect, the amendment provides the only contract or legal instrument whereby the state is mandated to bestow all or substantially all the rights, civil effects, and legal incidents of marriage upon the parties in recognition of the legal status created or established by said contract or instrument is the contract of marriage between one man and one woman.
We find that each provision constitutes an element of this plan. Specifically, the provisions of sentence one seek to preserve the concept of marriage in its definition, while the provisions of sentences two, three, and four seek to protect and reserve only to marriage the legal incidents and civil effects that necessarily flow to the couple from the state by operation of law based solely on the recognition of their legal status as husband and wife, i.e., their legal union.[31] Moreover, each provision is *737 germane to the object of "defense of marriage" and "constitute[s] a consistent and workable whole on the general topic embraced in that part which is amended," i.e., the "defense of marriage."
Accordingly, we find the constitutional amendment does not violate the "single object" requirement of La. Const. art. XIII, § 1(B), and therefore, we reverse the district court's declaration of unconstitutionality.

DECREE
For the foregoing reasons, we reverse the district court's declaration of unconstitutionality and find La. Const. art. XII, § 15 constitutional. We further dissolve the stay.
REVERSED.
CALOGERO, C.J., concurs and assigns reasons.
CALOGERO, Chief Justice, concurring.
In my earlier concurrence in this court's decision declining to consider the plaintiffs' myriad constitutional challenges prior to the election on this amendment, I observed that the most serious argument plaintiffs had raised was that the amendment violated the constitutional provision prohibiting the presentation of more than one object in a single amendment. Now that the court has been called upon to decide that issue for the first time in this case, I find the state's position more plausible. I agree with the majority that the single object provision only requires that an amendment to the constitution constitute a single plan, and that every subsection of the amendment need only be germane to the amendment's main purpose or object.
I wish to reiterate the majority's observations, at note 31, concerning the impact of this decision on property and contract rights of unmarried couples. Nothing in the majority opinion would prohibit an unmarried couple from contracting to be co-owners of property, from designating each other agents authorized to make critical end of life decisions, or from leaving property to each other through wills. The majority opinion does not disturb or impair the fundamental contract and property rights possessed by all individuals, be they homosexual or heterosexual, married or unmarried.
Finally, I express my respect for a conscientious district court judge who was called upon to make a highly principled decision on a close legal issue. The case did not require the district court judge to endorse gay marriage. It merely required that he apply a constitutional provision (single object) that is at least potentially ambiguous, and determine whether the amendment satisfied constitutional requirements. In conducting the requisite constitutional analysis, the judge engaged in a scrupulous interpretation of the law, *738 precisely the conduct we expect of members of the judiciary.
NOTES
[1] We find we have appellate jurisdiction. Moreover, the parties do not dispute the exercise of our appellate jurisdiction, and therefore, we will not discuss the application of our appellate jurisdiction in this case.
[2] Plaintiffs also filed a supervisory writ, 04-OC-2551, requesting we address the issues pretermitted by the district court. The intervenors also requested our review of the pretermitted issues by raising these issues in their second assignment of error. In the interest of judicial economy, all other issues raised will be addressed in the separate per curiam opinion, 04-2551 (La.1/19/05), 893 So.2d 738, rendered this day.
[3] As the facts and procedural history of this case are not in dispute, we rely upon the First Circuits's summation of the facts and procedural history in its ruling in this matter, see Forum for Equality PAC v. Honorable W. Fox McKeithen, 04-2182, p. 3-6 (La.App. 1 Cir. 10/13/04), 886 So.2d 1172 (per curiam), and the record, as well as the Petition Objecting to Election upon Proposed Constitutional Amendment filed by plaintiffs.
[4] We note from the outset that the pre-election procedural history is lengthy and complex. Prior to the election, Forum for Equality PAC, Laurence E. Best, Jeanne M. LeBlanc, and William Schultz filed suit in Civil District Court in Orleans Parish against defendants, Honorable W. Fox McKeithen, in his official capacity as Secretary of State ("the State"), and the City of New Orleans ("the City"). In this suit, which was allotted to Division "J" (presided over by Judge Nadine Ramsey), plaintiffs asserted that Act 926 could not be placed on the September 18, 2004 ballot because it would violate La. Const. Art. I, §§ 1, 3, 4, 22, and 23, and Art. XIII, § 1.

Thereafter, the State filed an exception of improper venue pursuant to La.Rev.Stat. Ann. § 18:1404 C, which provides that the exclusive venue to contest an election on a proposed constitutional amendment must be brought in East Baton Rouge Parish. The trial court, Judge Nadine Ramsey presiding, granted the exception of improper venue and dismissed plaintiffs' suit. The Court of Appeal, Fourth Circuit, affirmed the trial court's judgment. Forum for Equality PAC v. City of New Orleans, 04-1432 (La.App. 4 Cir. 8/24/04), 880 So.2d 1017. Plaintiffs applied for writs to this court in 04-C-2187. This court denied writs on September 2, 2004. Forum for Equality PAC v. City of New Orleans, 04-2187 (La.9/2/04), 882 So.2d 588.
At some point, plaintiffs re-filed their suit in East Baton Rouge Parish. In response, the State filed an exception of prematurity, alleging that no provision in the Election Code allows for a pre-election challenge to placement of a proposed constitutional amendment on a ballot. The trial court, Judge Michael Caldwell presiding, maintained the exception of prematurity and dismissed plaintiffs' suit without prejudice. The Court of Appeal, First Circuit, affirmed the dismissal of the suit on prematurity grounds. Forum for Equality PAC v. City of New Orleans, 04-1842 (La.App. 1 Cir. 8/23/04), 887 So.2d 45. Plaintiffs applied to this court, which denied the writ with Chief Justice Calogero concurring with reasons. Forum for Equality PAC v. City of New Orleans, 04-2185 (La.9/2/04), 882 So.2d 588.
For reasons which are not entirely clear from the record, a second and apparently identical suit was also filed in Civil District Court in Orleans Parish and allotted to Division "C" on the same day as the suit filed in Civil District Court allotted to Division "J". This suit allotted to Division "C" was presided over by Judge Pro Tempore Chris Bruno. Judge Bruno granted injunctive relief in favor of plaintiffs, enjoining the Secretary of State from placing the amendment on the ballot. The State appealed directly to this court. In Forum for Equality PAC v. City of New Orleans, 04-2104 (La.8/17/04), 882 So.2d 543, this court determined it lacked appellate jurisdiction and therefore transferred the case to the court of appeal. The court of appeal dismissed the appeal as moot. Forum for Equality PAC v. City of New Orleans, 04-1473 (La.App. 4 Cir. 8/24/04). In the interim between this court's ruling to remand and the court of appeal's ruling on mootness, Judge Bruno heard plaintiffs' petition for declaratory relief and permanent injunction and (1) declared the proposed constitutional amendment unconstitutional and (2) permanently enjoined the Secretary of State from placing the amendment on the ballot. On appeal, the court of appeal reversed the trial court's judgment granting the injunction. Forum for Equality PAC v. City of New Orleans, 04-1521 (La.App. 4 Cir. 8/30/04), 881 So.2d 777. Plaintiffs applied for supervisory writs, but this court declined to consider the application on timeliness grounds. Forum for Equality PAC v. City of New Orleans, 04-2239 (La.9/2/04), 882 So.2d 587.
[5] In their petition, plaintiffs stated:

16. The purpose of this Petition is to invalidate both a proposed constitutional amendment that appeared on the ballot on September 18, 2004, and to invalidate the vote on that amendment.
17. Both the Petition and the Plaintiffs expressly decline to raise or rely upon any federal constitutional rights, rulings or authorities, relying exclusively upon the Constitution of Louisiana, the rights enumerated therein and the ruling and authorities interpreting and applying that State Constitution.
18. Both the Petition and the Plaintiffs expressly decline to raise or rely upon any arguments, ruling or authorities, challenging the State of Louisiana's right to ban same sex marriage. While this Petition does not challenge that authority, it vigorously challenges extending and misusing any such authority to abolish any and all legal status or rights for Lesbian, Gay, Bisexual and Transgendered couples or households in Louisiana.
See 04-CA-2477, Record p. 8.
[6] Plaintiffs specifically rely upon La.Rev.Stat. Ann. §§ 18:1401 thru 1414. The First Circuit in its decision in this matter noted: "It is questionable whether a suit, or that part of a suit, seeking a declaration that a voter-approved constitutional amendment is in violation of the Louisiana Constitution is properly brought under the Election Code, with its accompanying exigency. Regardless, we expedite this matter as a courtesy to the parties, the citizens of Louisiana, and the Louisiana Supreme Court." See Forum for Equality PAC, 886 So.2d at 1173, n. 1.
[7] See 04-CA-2477, Record p. 9-10.
[8] For a discussion of this related case, see supra note 3.
[9] The above listed legislatures are all co-authors of the constitutional amendment. See 04-CA-2477, Record p. 74.
[10] In its oral reasons for judgment on the intervention, the district court explained:

In this case, they're asking for an intervention under 1091, which counsel is correct, the language of 1091 and the Clark opinion, you have to have an interest and a connexity to the principal action. They can join in on behalf of plaintiffs, they can join in on behalf of defendants or they can join in against both of them. And as I look at the petition for intervention and read it in connection with the petition that's filed in this matter, I can't say that the individuals, as citizens of the state, have any less interest in the subject of this case as do the original plaintiffs.... I am going to add, though, that the intervention is going to be a limited intervention....
* * *
I'm permitting all of them. The comment I made about the citizens was the fact that they may be members of the legislature in and of itself bestows no status that would say, we're coming in, we have an interest in this matter over and above anybody else. The fact that they've alleged that they're coming in as citizens, taxpayers and voters shows that they do have an interest under 1091 that would justify the granting of the petition for intervention.
See 04-CA-2477, Record p. 133-35.
[11] In its oral reasons for judgment on the exceptions, the district court stated:

The precise issue that's addressed in Count VI was whether or not the September 18, 2004, election was a statewide election. It's being raised in the suit today. It was previously raised in a prior suit in Orleans Parish in number XXXX-XXXXX, Division C-6. The Court of Appeal specifically ruled on that issue and found in favor of the secretary of state, that it was a statewide election, and dismissed that argument. I will acknowledge that we have now added additional plaintiffs, those being three just mentioned, Mr. Thibodeaux, Ms. Jacobs and Louisiana Log Cabin Republicans. I don't know how the addition of these plaintiffs somehow changed the law on this issue. And I realize you don't have an exact identity of parties, but to say you're going to lose an issue, then refile the suit and add an additional party, I don't think that defeats the purpose of res judicata. It's been a thing decided.
See 04-CA-2477, Record p. 141-42. Further, the Minutes of Court stated:
The Exception of Res Judicata and No Cause of Action were argued and submitted. For Oral Reasons assigned, the Court maintained the Exception of Res Judicata as to Count VI only. The Exception of No Cause of Action was, therefore, moot.
See 04-CA-2477, Record p. 2.
[12] The district court specifically stated:

As I look at this case, it's simply about compliance with the provisions of article XIII, section 1, of the Louisiana constitution of 1974 relative to the amendments to that constitution. In brief, plaintiffs have argued that the amendment, as presented to the voters and citizens of this state on September 18th of 2004, contained four separate objects which they contend require four separate amendments. The state, on the other hand, has argued that it contains a single object and, therefore, is in compliance with article XIII. With all due respect to the plaintiffs, the Court does not share your rather expansive interpretation of the proposed amendment as containing four objects. At most, it contains only two objects, those being same-sex marriages and same-sex civil unions or domestic partnerships. Based on the issue that's before this Court, two is enough, if found to be in existence, to violate the provisions of article XIII, section 1.(B). And in this case, the Court is of the opinion that there are two objects and my decision in this regard is based on several factors. The first one, probably, and the most important one, is the one suggested by Mr. Johnson. The Court took the amendment, read it, and based upon my literal reading of the amendment's language, comes to that conclusion. The very first sentence, "Marriage in the State of Louisiana shall consist only of the union of one man and one woman," this is entirely consistent with existing law. Louisiana Civil Code article 86 defines marriage as a legal relationship between a man and a woman that is created by civil contract. Clearly, the initial object of the amendment is to bring into the constitution what is already provided in the Louisiana Civil Code. The second sentence, "No official or court of this State of Louisiana shall construe this constitution or any state law to require that marriage or the legal incidents thereof be conferred upon any member of a union other than a union of one man and one woman," again, this is consistent with existing Civil Code provisions dealing with impediments to marriage and their effects. Civil Code article 89, which made same-sex marriage an impediment, states: Persons of the same sex may not contract with each other. Civil Code article 94 provides that a marriage contracted in violation of an impediment, which by reference incorporates Civil Code article 89, is an absolute nullity. Further, Civil Code article 96 provides that: A purported marriage between parties of the same sex does not produce any civil effects. We then move to the fourth sentence, "No official or court of the State of Louisiana shall recognize any marriage contracted in any other jurisdiction which is not the union of one man and one woman." This is likewise consistent with previously cited Civil Code provisions regarding the absolute nullity of such a marriage and that such marriage will produce no civil effects. The second and fourth sentences of the amendment simply address the effects the courts of this state will give to a marriage between persons of the same sex, whether performed within this state or performed outside the state. These can easily be construed as part of the object of the amendment dealing with the constitutional prohibition of same-sex marriages. The effect that courts of this state are to give to such marriage does not need to be dealt with in a separate amendment or proposition, but rather should be and were properly contained in that single amendment. In my opinion, this is consistent with the meaning and the intent of article XIII, section 1. (B) of our constitution and I think it's consistent with the interpretation given to that constitutional provision by the courts of this state which were cited by both sides. We had a laundry list of cases, but in my opinion each of those cases has to be limited to its facts. Each dealt with a different amendment, with different propositions, with questions of whether it was a single object or multiple object. The third sentence, "A legal status identical or substantially similar to that of marriage for unmarried individuals shall not be valid or recognized," and in my opinion this appears to be a catchall provision applying to all other situations or contracts other than same-sex marriage. This language clearly addresses civil unions or contracts between persons of the same sex that is otherwise not covered by the same-sex marriage ban. As such, I feel it constitutes a separate and distinct object which, under the provisions of article XIII, section 1.(B), require a separate amendment or proposal to address that object.
See 04-CA-2477, Record p. 222-26.
[13] La. Civ.Code art. 86 provides:

Art. 86. Marriage; definition
Marriage is a legal relationship between a man and a woman that is created by civil contract. The relationship and the contract are subject to special rules prescribed by law.
La. Civ.Code art. 89 provides:
Art. 89. Impediment of same sex
Persons of the same sex may not contract marriage with each other. A purported marriage between persons of the same sex contracted in another state shall be governed by the provisions of Title II of Book IV of the Civil Code.
La. Civ.Code art. 94 provides:
Art. 94. Absolutely null marriage
A marriage is absolutely null when contracted without a marriage ceremony, by procuration, or in violation of an impediment. A judicial declaration of nullity is not required, but an action to recognize the nullity may be brought by any interested person.
La. Civ.Code art. 96 provides:
Art. 96. Civil effects of absolutely null marriage; putative marriage
An absolutely null marriage nevertheless produces civil effects in favor of a party who contracted it in good faith for as long as that party remains in good faith.
When the cause of the nullity is one party's prior undissolved marriage, the civil effects continue in favor of the other party, regardless of whether the latter remains in good faith, until the marriage is pronounced null or the latter party contracts a valid marriage.
A marriage contracted by a party in good faith produces civil effects in favor of a child of the parties.
A purported marriage between parties of the same sex does not produce any civil effects.
La. Civ.Code art. 3520 provides:
Art. 3520. Marriage
A. A marriage that is valid in the state where contracted, or in the state where the parties were first domiciled as husband and wife, shall be treated as a valid marriage unless to do so would violate a strong public policy of the state whose law is applicable to the particular issue under Article 3519.
B. A purported marriage between persons of the same sex violates a strong public policy of the state of Louisiana and such a marriage contracted in another state shall not be recognized in this state for any purpose, including the assertion of any right or claim as a result of the purported marriage.
[14] Although acknowledging that it was not binding on the court, the district court was further persuaded in part by Chief Justice Calogero's concurring opinion in Forum for Equality PAC v. City of New Orleans, 04-2185 (La.9/2/04), 886 So.2d 1084, in which he explained the amendment compelled voters to decide whether to deny same-sex couples the right to marry and the right to enter into civil unions. See O4-CA-2477, Record p. 226-27.
[15] The Court of Appeal specifically held:

As the supreme court has exclusive appellate jurisdiction to review the declaration of unconstitutionality, it also has jurisdiction over all other issues involved in this case. See Louisiana Electorate of Gays and Lesbians, Inc. v. State, 99-2949 (La.App. 4 Cir. 11/14/01), 806 So.2d 678, 684 (on application for rehearing en banc); see also Churchpoint Wholesale Beverage Co. v. Tarver, 614 So.2d 697, 700-01 (La.1993). As observed by the fourth circuit, "[i]t defies logic and any consideration of judicial economy to split any case, much less a complex case, into different appeals, within different tribunals." Louisiana Electorate, 806 So.2d at 683.
Forum for Equality PAC, 04-2182 at p. 6.
[16] This legislative history can be found on the official web cite of the Louisiana State Legislature, http://www.legis.state.la.us.
[17] The digest to Original House Bill 61 prepared by the House Legislative Services, which constitutes no part of the legislative instrument, provided:

Abstract: Defines marriage as a union between one man and one woman.
Proposed constitutional amendment defines marriage in Louisiana as the union of one man and one woman and provides that the state shall not be required to confer marital status or legal incidents thereof upon unmarried couples or groups.
Proposed constitutional amendment prohibits the recognition by any official or court of a marriage contracted in another jurisdiction unless it is a union between one man and one woman. Provides for submission of the proposed amendment to the voters at the statewide election to be held November 2, 2004.
(Adds Const. Art. I, § 27)
[18] The digest prepared by House Legislative Services for Engrossed House Bill 61 added the following text to the previous digest for Original House Bill 61 (see supra, note 19):

Proposed constitutional amendment provides that marriage in Louisiana is the union of one man and one woman and prohibits officials or courts from conferring marriage or the legal incidents thereof upon any union other than the union of one man and one woman.
Proposed constitutional amendment provides that a legal status similar to that of marriage shall not be valid or recognized for unmarried individuals.
* * *
Summary of Amendments Adopted by House Committee Amendment Proposed by House Committee On Civil Law and Procedure to the original bill.
1. Provides that a legal status similar to marriage shall not be valid or recognized for unmarried individuals.
2. Clarifies that no official or court of this state shall construe the constitution or laws of this state as requiring marriage or the legal incidents thereof to be conferred upon same sex unions.
[19] The Digest of Bill as Finally Passed by Senate added the following text to the previous digest of the Engrossed House Bill (see supra, notes 19 and 20):

Provides for submission of the proposed amendment to the voters at the statewide election to be held September 18, 2004.
(Adds Const. Art. XII, § 15).
[20] The House Bill Resume Digest for Act No. 926 provides:

Proposed constitutional amendment provides that marriage in Louisiana is the union of one man and one woman and prohibits officials or courts from conferring marriage or the legal incidents thereof upon any union other than the union of one man and one woman. Provides that a legal status similar to that of marriage shall not be valid or recognized for unmarried individuals.
Proposed constitutional amendment prohibits the recognition by any official or court of a marriage contracted in another jurisdiction unless it is a union between one man and one woman.
Provides for submission of the proposed amendment to the voters at the statewide election to be held September 18, 2004.
(Adds Const. Art. XII, § 15)
[21] Note, in the 1879, 1898, and 1913 constitutions the word "time" was used instead of the word "election."
[22] Graham is noteworthy as the first opinion by this Court which invalidated a constitutional amendment.
[23] As evident from the citations throughout this opinion, this Court drew from the jurisprudence and law of other jurisdictions in formulating our "single object" rule with its cites to AMERICAN JURISPRUDENCE and Cooley's treatise on Constitutional Law, CONSTITUTIONAL LIMITATIONS (8th ed.), as well as to the opinions of the high courts of other states, such as Arizona and Idaho, quoted above. Logically, one can conclude the requirements of other states as to the "single object" rule were a substantial source of our own "single object" rule. Therefore, this Court may look to the jurisprudence of other jurisdictions in its analysis of our "single object" requirement.
[24] In the interim between its decisions in Graham and Miller, this Court decided Hotard v. City of New Orleans, 213 La. 843, 35 So.2d 752 (1948). The Hotard case presented the issue of whether 1938 La. Acts 385 proposed only one amendment "authorizing the city, acting through the Public Belt Railroad Commission, to construct, maintain and operate one or more railroad passenger stations in New Orleans and as an incident thereto to eliminate certain grade crossings." Hotard, 35 So.2d at 754. Chief Justice O'Niell, writing for the majority, held:

The constitutional amendment in question is really only one amendment, authorizing the city to establish and maintain one or more railroad passenger stations, and, as an incident thereto, to eliminate certain grade crossings of tracks entering the station or stations. This new section  31.3 of Article 14  is necessarily a long section because it embodies all of the details concerning the authority which was conferred upon the city. It covers nearly five pages of the Constitution; but all of its provisions relate to the one purpose of authorizing the city, acting through the Public Belt Railroad Commission, to construct, maintain and operate one or more passenger stations, and, as an incident thereto, to eliminate grade crossings. The provisions of the amendment are so interrelated that it would not have been feasible to submit each one of them to the voters as a separate and independent amendment of the Constitution. If they had been so submitted, and if the voters had voted for some of the propositions and against others, the purpose of the amendment might have been defeated.
* * *
[In Graham v. Jones,] it was found by a majority of the members of the court that the constitutional amendment really consisted of several separate and distinct amendments of several sections of the Constitution. That is not true in this case because all of the provisions of the one amendment in this case relate to the main purpose of establishing and maintaining and operating one or more railroad passenger stations, with all approaches thereto and appurtenances thereof. As we have pointed out it would have been impractical if not impossible to submit the several provisions of this amendment so that the voters could vote intelligently and effectually upon each provision separately.
Hotard, 35 So.2d at 755. Apparently, the Court found Graham clearly distinguishable, and therefore, its holding was inapplicable. In effect, the Court appears to adopt the broad construction enunciated in Chief Justice O'Niell's dissent in Graham. Note, the author of the opinion was the most vocal dissenter in Graham.
[25] In essence, Miller falls within the broad construction continuum first advanced by Chief Justice O'Niell in his dissent in Graham, apparently applied by the Court in Hotard, and subsequently adopted in Miller.
[26] As evident from the legislative history of Act 926, this title was adopted very early on in this Act's history, as the Act was prefiled on March 1, 2004, and the proposed title was amended to reflect "defense of marriage" rather than "definition of marriage" on May 12, 2004. The House Bill was enrolled as Act No. 926 on July 12, 2004.
[27] According to the Legislative Calendar, the title, "Defense of Marriage," was adopted by the House on May 18, 2004, and by the Senate on June 9, 2004. See supra, section Legislative History of Act 926.
[28] These Senate committee minutes discuss the duplicate bill to House Bill 61, Senate Bill 166.
[29] We note both bills, House Bill 61 and its duplicate Senate Bill 166, were opposed in the committees. Opponents testified to the lack of a real need for such an amendment given our present statutory law, noted the discriminatory motivations for the amendment, and debunked as a scare tactic the theory that the amendment protects marriage, family, procreation, and children, specifically stating "in talking about protecting children and marriage that we could better put our time towards trying to find resolutions to the fact that we have one out of four children in this state living in poverty, an education system that is going to take a lot of work and that we have a lot of children that are uninsured, not to mention the high divorce rate." See Senate Minutes, pp. 9-11 (specifically James Fischer speaking); see also, House Minutes, p. 9-12. Essentially, the opponents advocate: "[w]e need to work towards things that unite us as citizens and not something like this that separates us as citizens of this state." See Senate Minutes, p. 11 (James Fischer speaking).
[30] As noted by amici curiae in their brief, this same argument could be made to invalidate several constitutional amendments, as proposed by the Legislature and subsequently ratified by the voters of this State, such as:

(1) 1994 La. Acts 48 adding Art. VI, § 30.1 (proposing to add Article VI, Section 30.1 relative to the bonding and taxing authority of public entities other than the state and to provide certain restrictions and limitations on such entities and for certain limitations on the legislative granting of such power).
(2) 1995 La. Acts 1326 adding Art. III, § 4(E) (proposing to add Article III, Section 4(E) relative to terms of office of certain elected public officials and terms of Senators and Representatives).
(3) 1996 La. Acts 98 adding Art. XII, § 6(C) (proposing to add Article XII, Section 6(C) to require elections in localities before new forms of gaming, gambling, or wagering may be conducted therein or before existing forms of gaming, gambling, or wagering may be conducted in new areas, to authorize the legislature to enact local or special laws for the holding and conducting of elections on propositions relating to allowing or prohibiting one or more forms of gaming, gambling, or wagering therein and for elections on riverboat gaming, gambling, or wagering propositions).
(4) 1997 La. Acts 1487 adding Art. I, § 25 (proposing to add Article I, Section 25 to provide for rights of victims of crimes).
(5) 1998 La. Acts 1st Ex.Sess. 170 amending Arts. VII and VIII; adding Art. VIII, § 7.1 (proposing to amend Article VII and Article VIII and to add Article VIII, Section 7.1 "relative to providing for governance and management of education to create and provide for the Louisiana Community and Technical College System; to create and provide for the Board of Supervisors of Community and Technical Colleges as a management board for the system subject to the planning, coordinating, and budgeting responsibility of the Board of Regents; to provide for members to be appointed by the governor; to provide relative to the consent of the Senate and the terms of members; to provide for student membership on the board; to empower the board with supervision and management of all public postsecondary vocational-technical education programs and institutions of higher education awarding certain types of degrees as assigned by law; to require divisions within the Louisiana Community and Technical College System; to revise the powers and duties of the Board of Regents to extend its authority over postsecondary education; to revise certain references; to provide with regard to the requirements to create a new institution of postsecondary education, transfer an institution of higher education from one management board to another, merge any postsecondary institution into any other postsecondary institution, or establish a new management board; to temporarily require certain minimum funding for postsecondary institutions; to provide relative to the authorization to allocate money appropriated out of the Louisiana Quality Education Support Fund for postsecondary educational purposes; to require the appropriation of certain funds for vocational-technical education purposes; to provide for the effectiveness of the proposal if approved by the electorate").
(6) 1999 La. Acts 1392 adding Art. VII, §§ 10.8, 10.9, 10.10 (proposing to add Article VII, Sections 10.8, 10.9, and 10.10 "relative to state funds; to create the Millennium Trust and the Louisiana Fund in the state treasury; to create the Health Excellence Fund, the Education Excellence Fund, and the TOPS Fund within the Millennium Trust; to provide for deposit of monies into the Millennium Trust and the credit of monies to the funds within the trusts; to provide for deposit and credit of monies in the Louisiana Fund; to provide for investment and uses of monies in the Trust and in the funds; to create the Millennium Leverage Fund in the state treasury, and to provide for deposit, use, and investment of monies in the fund; to provide for the issuance of revenue bonds and the security for the payment of such bonds; to provide for the expenditure of the proceeds of such bonds; to authorize use of certain funds for security for such bonds").
(7) 2004 La. Acts 927 adding Art. I, § 27 (proposing to add Article I, Section 27 relative to the declaration of rights; to preserve the freedom to hunt, fish, and trap, subject to regulation, restriction, or prohibition imposed pursuant to law).
[31] As noted by the State in its brief to this court, this constitutional amendment would not impair any property rights, which are not "identical or substantially similar to" the package of unique property rights necessary to marriage. For example, the amendment would not prohibit an unmarried couple (either a same-sex couple or opposite-sex couple) from contracting to be co-owners of certain specific property they purchase together or from contracting with each other to designate each other his/her agent for making critical life or medical decisions for him/her in cases of medical emergencies where he/she might not be conscious or contracting as to one's power of attorney; nor does this amendment prohibit an unmarried couple from making wills leaving their estates to one another. See as reference Brief of Defendant-Appellant W. Fox McKeithen on the Merits, Forum for Equality PAC v. Honorable W. Fox McKeithen, 04-2477, 04-2523 (La.1/19/05), 893 So.2d 715.